# Illinois Official Reports

## Appellate Court

---

### *People v. Martinez*, 2021 IL App (1st) 190490

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN MARTINEZ, Defendant-Appellant. |
| District & No. | First District, Second Division<br>No. 1-19-0490 |
| Filed | June 29, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-6197; the Hon. Angela M. Petrone and the Hon. Marcus R. Salone, Judges, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Joshua Tepfer, Karl Leonard, and Debra Loevy, of The Exoneration Project at the University of Chicago Law School, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
              Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the
              judgment and opinion.

## OPINION

¶ 1       On October 12, 1998, Daniel Garcia was severely beaten in an alley near Whipple Street and Armitage Avenue. He died two months later from cranial cerebral injuries. Defendant, John Martinez, was charged in this incident alongside codefendants, Jose Tinajero and Thomas Kelly. Following a bench trial, defendant was convicted of first degree murder and sentenced to 25 years in prison.

¶ 2       This appeal arises from the second-stage dismissal of defendant's successive petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). On appeal, defendant asserts the trial court erroneously dismissed his claims that (1) Detective Reynaldo Guevara's manipulation of evidence violated his right to due process; (2) the State failed to disclose evidence of the detective's misconduct, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) new evidence demonstrated his innocence. For the following reasons, we reverse and remand for an evidentiary hearing.

¶ 3                               I. Background
¶ 4                                A. Trial
¶ 5       To set the scene, we note there is no dispute that defendant was in the alley where Garcia was killed on the night he was killed. Rather, defendant disputes that he participated in the attack and claims that he came upon Garcia at the attack's conclusion.

¶ 6       At trial, the State presented witnesses who were supposedly in the area of the attack and subsequently spoke with Detective Guevara. Those witnesses' accounts at trial varied from their accounts memorialized by the police and the assistant state's attorney. Additionally, three witnesses—Manuel Rodriguez (Manuel), his brother Esteban Rodriguez (Esteban), and Jesus Fuentes—demonstrably struggled with a language barrier while testifying, notwithstanding the assistance of an interpreter. Melloney Parker, who lived near the scene, professed to have a poor memory at the time of trial and expressly stated that she was relying on the accuracy of her prior statement, which was itself made months after the attack. These issues contributed to a somewhat laborious trial.

¶ 7       Manuel testified that one or two nights before the attack, Garcia asked Manuel to drive him to the area of Armitage Avenue and Whipple Street for the purported purpose of buying beer. When Rodriguez turned south on Whipple Street, Garcia told him to stop the car. Garcia exited, exchanged words with a heavyset black woman standing on the curb, and then followed her into the alley. Manuel then knew that Garcia was buying drugs, not beer. Garcia eventually ran out of the alley, got back in the car with cocaine, and told Manuel to "step on it."

¶ 8       Fuentes testified that at about 1:30 a.m. on October 12, 1998, he and Esteban were drinking beer with Garcia. Fuentes had consumed three or four beers starting at about 10 p.m. or 11 p.m. Fuentes then drove Garcia, Esteban, and Fuentes's six-year-old son to buy beer. When Fuentes's van arrived at Albany Avenue and Armitage Avenue, Garcia exited the car and told Fuentes to wait there. Fuentes did not see where Garcia went. After about 15 minutes, Fuentes

drove around looking for him. Specifically, Fuentes drove down Whipple Street and back to a spot near the place where Garcia told him to wait.

¶ 9    After 10 minutes, Fuentes circled a second time and saw five or six young men, about 40 feet away, playfully shoving each other in the alley by Whipple Street. Four of them had short hair. The area was lit by streetlight, and a van was parked 10 to 15 feet from where the group was standing. Fuentes was able to see the faces of the men who faced his direction. Although Fuentes apparently made an in-court identification of defendant and codefendants as members of that group, the attorneys did not make a clear record of that identification at trial.[1] Fuentes testified that it "[s]eems like" defendant was one of the two men he saw wearing sweatshirts. Fuentes did not see Garcia, however, and circled a third time.

¶ 10    About 30 minutes after Garcia had first exited Fuentes's car, Fuentes saw a young man lying facedown where the group of men had been. That man proved to be Garcia, who was unconscious. When Esteban was unable to get Garcia into the car, he and his companions left to tell Garcia's family about the situation. In addition, Fuentes flagged down a police car, but the language barrier prevented him from obtaining assistance. Fuentes testified that he never saw anyone hit or push Garcia.

¶ 11    Esteban substantially corroborated Fuentes's trial account. Additionally, he identified defendant and codefendants as having been with the group playing, pushing, and kicking each other in the alley. Esteban also testified, however, that he "was not able to see it very well." Esteban could not say what defendant was wearing that night or describe whether he had any facial hair because he was too far away.

¶ 12    Margarita Casiano lived in the area and bought drugs there daily. She testified that she saw defendant, codefendants, and "Rabbit," apparently referring to Angel Serrano, in the alley on October 13 or 14, which we observe was not the date of the attack. We also note that Serrano was interviewed but not charged in this case. After Garcia died, Manuel, Esteban, Fuentes, and Casiano all spoke with Detective Guevara.

¶ 13    During his testimony Detective Guevara acknowledged that his report did not reflect that Esteban or Fuentes said a group of four or five guys were playing in the alley. Yet, Esteban testified that he had relayed similar information to Detective Guevara at some point. Additionally, Detective Guevara ultimately testified that he interviewed Fuentes only once and that Fuentes never described anyone he saw on the night of the beating. Curiously, Fuentes testified that while he and Esteban initially did not describe anyone in order to avoid trouble, they subsequently described the men they had seen when Detective Guevara drove them to the scene on the night they were interviewed. The detective did not recall whether he drove them to the scene.

¶ 14    According to Detective Guevara, when he interviewed Esteban again in February 1999, Esteban relayed the same information that he had testified to in court. Esteban also told Detective Guevara at that interview, however, that four people at the mouth of the alley started yelling and throwing bottles at them as Esteban tried to get Garcia into Fuentes's car. During his testimony, Esteban denied telling Detective Guevara this. Fuentes similarly testified that no one chased his van or threw bottles at it.

¶ 15    Detective Guevara testified that on February 23, 1999, Fuentes and Esteban identified three

---

[1]The failure to make a clear record of in-court identifications was a recurring problem at trial.

individuals, apparently defendant and codefendants. According to Fuentes, he never told Detective Guevara that he saw those individuals actually hit Garcia. Furthermore, Fuentes testified that Detective Guevara stayed outside the lineup room and Esteban testified that the detective did not help him identify anyone. Although Detective Guevara had given Esteban a ride to view the lineup, Esteban denied that they discussed the case *en route* to the station.

¶ 16    The State's key witness was Parker, who lived in a third-floor apartment near Whipple Street and Armitage Avenue on October 12, 1998. Her living room window overlooked Whipple Street, and she had an unobstructed view of the alley, notwithstanding a tree that was in front of her window. Based on what she saw from her window that night, she made an anonymous call to 911. She ultimately encountered Detective Guevara, who was present when she signed a written statement.

¶ 17    Before reciting the substance of Parker's testimony about the night Garcia was attacked, we reiterate that she provided certain details that conflicted with her written statement or was otherwise unable to recall details. In those instances, she repeated that her memory was better at the time of her statement. Furthermore, she knew the statement was accurate because she signed it and she had been "very sure" of her observations at that time. Yet, she testified that "as of today, I am not sure. It's not vivid in my head."

¶ 18    Parker testified that at about 1:55 a.m. on the night in question, she woke up and noticed six or seven young men in various places in the alley. She saw two of their faces. In court, Parker identified defendant and codefendant Kelly as having been part of the group. In contrast, during a previous lineup, Parker had identified defendant and codefendant Tinajero but not codefendant Kelly. Parker later acknowledged while testifying that codefendants looked so much alike that she could not now tell them apart. Parker further testified that while she did not socialize with defendant, she had seen him in the area before.

¶ 19    According to Parker's testimony, the young men in the alley appeared to be making drug transactions. When a Hispanic man walked through the alley, someone asked, "Where's my money?" Parker testified that she was unable to determine who asked that question but later acknowledged that her statement said codefendant Tinajero had done so. Parker also testified that, in the parking lot adjacent to the alley, the same man hit the Hispanic man, apparently referring to Garcia.[2] Others then joined in the attack.

¶ 20    While the men fought, Parker could only see the backs of their heads. She later acknowledged that although there was artificial lighting, the distance, darkness, and similar appearances of the men contributed to her difficulty seeing faces. When asked if the brevity of the incident contributed to that inability, she answered, "I guess it did; I don't know."

¶ 21    Parker added that "[e]veryone jumped in at one point."

> "Q. So, as you sit here today, you cannot tell us for sure that this man here, John Martinez, was actually hitting, correct?
> A. I can't say that because I saw everyone outside join in hitting the guy.
> Q. But you can't specifically—
> A. He was one of the guys."

In contrast, Parker's prior statement said that she "saw *some* other male Hispanics who had been in the alley surround Garcia as Garcia lay on the ground." (Emphasis added.)

---

[2] Her statement added that Garcia fell so that he was partially behind a silver van.

- 4 -

Furthermore, Parker's statement explicitly said that defendant was one of the men she saw punch Garcia, but Parker testified that she did not remember telling the police that.

¶ 22 After the initial fight, one person left to make a transaction and then returned to kicking the victim. This happened twice. The same person said he was "getting out of there." The statement identified this person as codefendant Tinajero, although Parker could not identify that person in court. Her statement added that at some point, some of the men yelled at codefendant Tinajero to stop, but he carried on. Parker's statement further alleged that during the attack, codefendant Tinajero struck two different vans with a chair after speaking to their occupants. When codefendant Tinajero left, the others left too.

¶ 23 At about 10:30 p.m. on January 24, 1999, police came to Parker's apartment and showed her photos. Parker first testified that she did not recognize anyone at that time but subsequently testified that she had identified codefendant Tinajero's photo. When asked whether she saw the person she had identified that night in the courtroom, she testified, "It look like it might be one of them right here; I am not for sure now that you have the-picture right here in front of my face." She had been sure, however, on the night she picked out that photo.

¶ 24 Parker testified that she subsequently identified two or three people from a lineup on February 3. With respect to their role in the beating, she testified, "I believe they took part in it, yes." She denied that it was difficult to pick out individuals in the lineup because the offenders were Hispanic and looked similar. When she saw defendant in the lineup, she recognized him not only from seeing him at the scene that night but from seeing him other times.

¶ 25 Parker testified that she provided a handwritten statement on February 8, 1999. Assistant State's Attorney (ASA) Jacob Rubinstein wrote the statement, and Parker read and signed it. Yet, when asked if she had signed exhibit C, a photo of defendant, Parker testified, "I never saw the defendant's face." She later testified that when she gave her written statement, she identified the people whom she had seen.

> "Q. What you said in the statement about John Martinez, you are not sure today that it's *** 100 percent accurate because you don't remember what you said that night, right?
>
> A. Correct. I remember probably 50 percent."

¶ 26 Parker acknowledged feeling that she had been at the police station too long on the night of her statement.

> "Q. So, as the State's Attorney was asking you these questions, at some point in time, did you kind of just go along with it because you wanted to get out of there, too?
>
> A. Probably so, yes.
>
> Q. And so you signed it and initialed it where they told you to sign it and initial it because you wanted to go home, right?
>
> A. Correct."

Parker later testified that she signed the statement because it was correct, not simply because she had been there too long. When asked whether she believed the statement was true because she did not want to be charged with perjury, she answered, "No, I don't." Her statement also alleged that no promises or threats had been made.

¶ 27 Detective Guevara testified that he interviewed Parker at her apartment and showed her a photo array at about 8:30 p.m. on January 24, 1999. She identified a photo of codefendant

Tinajero. The detective returned to Parker's apartment with more photos on February 6, 1999, but he did not show them to her because "she did not want to cooperate at that time." At about 9:15 p.m. on February 8, 1999, Detective Guevara returned to Parker's home and asked her to come to Area 5 to view a lineup. On either February 6 or February 8, the detective told her he had identified the possible offenders. Detective Guevara further testified that he spoke to Parker before the lineup. She was very cooperative and did not act like she wanted to leave.

¶ 28       Detective Guevara testified that from a lineup of 10 or 11 people, Parker identified defendant and codefendant Tinajero but not codefendant Kelly. Parker and Detective Guevara were alone in the lineup room. Afterward, Parker spoke to ASA Rubinstein, who took a handwritten statement. ASA Rubinstein, Parker, and Detective Guevara signed the statement and the attached photos of defendant, codefendant Tinajero, and Garcia.

¶ 29       ASA Rubinstein testified that on February 9, 1999, after he had taken Parker's statement, he spoke with defendant in the presence of Detective Troche for 45 minutes. ASA Rubinstein did not tell defendant that he intended to charge him or that he was in trouble. No one asked him if he would rather act as a witness in this case. At one point, the detective left the room and ASA Rubinstein asked defendant how he had been treated. Defendant said he felt well, was treated fine, had enough food to eat, and was permitted to use the bathroom. At around 6:45 p.m., ASA Rubinstein wrote defendant's statement as the two men conversed, and they finished at about 8:15 p.m. Defendant read part of the statement to demonstrate that he could read English.

¶ 30       According to defendant's statement, he arrived at Whipple Street and Armitage Avenue, the Latin Kings' territory, at about 1 a.m. on October 12, 1998. The Latin Kings sold drugs on that block, and some Latin Kings were already present, including codefendant Tinajero, codefendant Kelly, and Serrano. While defendant was walking around, he heard men's voices and went to the alley, where he saw Garcia, lying facedown on the ground. Several Latin Kings surrounded Garcia. As defendant approached, he observed blood around Garcia's head. Someone said that Garcia belonged to a rival gang. We note that no evidence showed defendant did belong to a gang.

¶ 31       The statement said that because Garcia was a rival gang member, defendant gave him "a hard kick" to the side of his ribs. He kicked Garcia a second time, although not as hard, to tell him to get out of the area. When defendant used his foot to roll Garcia over, defendant heard "a sucking sound," as though Garcia was struggling to breath. Defendant now saw that Garcia's face was bloody and beaten, and he left the scene. According to the statement, ASA Rubinstein and the police had treated him well. "Defendant has been given pop to drink, chips and salsa to eat and was offered other food to eat." At the time of his statement, defendant had been in police custody for two days.

¶ 32       Defendant testified that on the night in question, he was talking to a girl who lived on Whipple Street when he heard yelling and walked to the alley. He saw a man facedown on the ground behind a silver van and saw codefendant Tinajero walk away from him. Defendant approached the man, nudged him once with his foot, and turned him over but did not recognize him. The man's face was smashed in, and he was having trouble breathing. Defendant testified, "[a]nd I'm like man, I'm out of here." He did not get help because he wanted to distance himself from the situation. He did not see codefendant Kelly or Serrano in the immediate vicinity, although they were "on the block."

¶ 33       According to defendant, he was brought to Area 5 at about 7:30 p.m. or 8 p.m. on February

8, 1999. Detective Guevara aggressively questioned him and yelled at him for about 10 minutes. He then switched places with Detective Troche, who did more of the same. Defendant told the police what he had seen and denied saying that he gave the victim a hard kick. In addition, defendant spent two days in a windowless room before signing a statement. During that time, he ate a bag of chips, as well as chips and salsa. He was not offered other food to eat. He denied being given soda and testified that he drank water from the faucet when he used the restroom. During this period, people kept coming in and out of the room, preventing him from sleeping.

¶ 34 Eventually, Detective Troche told him that an assistant state's attorney was coming to talk to him and that defendant would go home after he signed some papers. He told defendant not to worry because he had not killed anyone. Because defendant had only nudged the victim with his foot, he would be used as a witness against codefendant Tinajero.

¶ 35 ASA Rubinstein questioned him in the early morning hours of February 9 without writing anything down. Defendant denied telling ASA Rubinstein that someone told him the victim belonged to a rival gang or that he gave the victim a hard kick. Additionally, defendant told ASA Rubinstein that there was one Latin King standing by the victim, not multiple Latin Kings. Defendant further denied that ASA Rubinstein wrote the statement in front of him or that defendant had read part of the statement. Rather, defendant did not read English well and signed the statement without reading it.

¶ 36 The parties stipulated that Detective Troche would deny telling defendant that he would be able to go home if he signed something. Detective Troche would also testify that defendant slept the night away in his room and was fed.

¶ 37 The trial court found defendant guilty of first degree murder. The court found there was "considerable question" as to the accuracy of Esteban's testimony and Fuentes's testimony. Yet, "I believe that we can discount the testimony of Mr. Rodriguez without causing any challenge to the accuracy of the testimony of Miss Melanie Parker." While Parker was uncertain about details at trial, "[s]he was certain and unequivocal that her recollection which was reduced to writing was an accurate one." Her reluctance to merely "go off the paper" heightened her credibility. The court acknowledged defendant's testimony that he played a minimal role in what transpired" but found that "that is not the recollection of Miss Parker." [3]

¶ 38                                B. Posttrial Proceedings

¶ 39 Defendant moved for a new trial based on new information regarding Parker. At a hearing on the motion, Parker testified that there was an active warrant for her arrest for the possession of stolen property at the time the police interviewed her regarding Garcia's murder. When police officers, including Detective Guevara, came to her house, they knocked on her door and displayed a warrant accompanied by her photo. The detectives said they wanted her to look at photos and took her to the police station, where she was placed in an interview room with the door closed. The police did not tell her she was under arrest.

¶ 40 Parker testified that Detective Guevara made no threats with respect to the warrant but told her that the warrant would be quashed if she looked at pictures and identified the men she saw at the scene. She proceeded to identify photographs of people she saw there. The police

---

[3]Codefendants were also convicted.

identified the victim's photograph for her, however, as she had not seen him. Parker testified that she identified defendant based on what she had seen, not based on the threat of arrest. When the police pulled her car over a year later, she learned that the arrest warrant was still active.

¶ 41    The trial court denied defendant's motion, finding that she had "not equivocated from her identification of Mr. Martinez as one of the attackers." Additionally, Parker's "testimony implicates Mr. Martinez to a greater extent than the statement of Mr. Martinez." The court subsequently sentenced defendant to 25 years in prison for first degree murder.

¶ 42                                    C. Direct Appeal

¶ 43    On direct appeal, we affirmed the trial court's judgment, rejecting defendant's assertion that the evidence was insufficient to sustain his conviction. We also rejected his assertions that the trial court erroneously admitted Parker's written statement as substantive evidence, that the State improperly admitted his written statement after it rested its case-in-chief, and that trial counsel was ineffective for not moving to suppress his inculpatory statement. *People v. Martinez*, 348 Ill. App. 3d 521 (2004).[4]

¶ 44                                    D. Postconviction

¶ 45    Defendant filed his first postconviction petition under the Act on April 1, 2006. That petition is missing from the trial court's file and, in turn, our record on appeal. The trial court summarily dismissed that petition on April 17, 2006.

¶ 46    In 2013, defendant commenced these proceedings by filing a successive postconviction petition, which survived to the second stage. Defendant, through the Exoneration Project, filed an amended petition and supplemental petitions. He asserted that evidence of Detective Guevara's pattern and practice of engaging in investigative misconduct, including improperly influencing eyewitness identifications, would have led to a different result at trial. Additionally, the State failed to disclose such evidence, in violation of *Brady*. This evidence alongside new expert testimony regarding witness identification demonstrated his actual innocence.

¶ 47    Defendant provided thousands of pages in exhibits, some of which involved misconduct in other cases and some of which were specific to this case. Defendant's evidentiary sources for Detective Guevara's misconduct included allegations made by a police officer as well as FBI reports, citizens' affidavits or testimony, Office of Profession Standards (OPS) documents, and judicial decisions. In a report commissioned by the City of Chicago, attorney Scott Lassar provided evidence substantiating many citizens' complaints about the detective's misconduct. Detective Guevara also invoked the fifth amendment when asked questions about manipulating dozens of witnesses to make false identifications. Given the staggering breadth of the materials regarding Detective Guevara's involvement in other cases, we succinctly state that those materials reflected a penchant for manipulating witness identification. Many of his victims were eventually exonerated.

---

[4]The reviewing court characterized this offense as gang-related, but the record suggests that the trial court found otherwise. During the State's cross-examination of defendant, the court stated, "I don't know where we're going with all this gang stuff. It's not working for me. *** What's the purpose in it?"

¶ 48    Pertinent to Garcia's murder, Detective Guevara was questioned at length about this investigation while testifying in an unrelated case. He repeatedly invoked the fifth amendment when asked about his conduct with respect to Esteban, Fuentes, Casiano, Parker, and defendant himself. Former assistant public defender James Saltouros submitted an affidavit placing doubt upon a police report that said he was present for a lineup in this case. While he did not specifically recall this case, he had only ever attended one lineup. Moreover, defendant's trial attorney, John Deleon, submitted an affidavit stating that at trial, he had believed that Detective Guevara improperly influenced Parker's identification and testimony, not to mention evidence provided by other witnesses, and that he would have used information of the detective's other misdeeds to impeach his credibility.

¶ 49    Eladio Valdez, an investigator for the Exoneration Project, provided an affidavit alleging that when he and defense counsel spoke with Parker on August 5, 2016, she said that she could not make out the offenders' faces during the attack. Parker also said that when Detective Guevara came to her home in February 1999, he told her she had to accompany him to the police station because of the arrest warrant and that, if she provided the information he wanted, he would take care of the warrant. In addition, Parker said that when she viewed the lineup, Detective Guevara told her that the offenders who beat Garcia were present and "that they knew they had the right people because they had searched their apartments and found bloody boots that they had used to stomp the victim." We observe that no trial evidence showed that the police recovered bloody boots. Moreover, Parker stated that she "did not know if John Martinez participated in the beating." She identified him in the lineup because she saw him in the alley. She believed Detective Guevara would have her arrested if she did not identify anyone.

¶ 50    Valdez and defense counsel returned to Parker's home later that month and asked her to sign an affidavit setting forth what she previously told them. She responded that they might be able to "tell her what to say" if they showed her "dollar signs" or "treated her to lunch."

¶ 51    Dr. Geoffrey R. Loftus's report discussed the dangers of reconstructed memories, lineups containing multiple suspects, and the absence of double-blind lineup procedures. Additionally, he found that unconscious transference, which occurs when the witness identifies a suspect whom she has seen before due to mere familiarity, may have impacted Parker's identification. He discussed the negative impact of distance and darkness as well as the limitations of streetlights, which are dim by design. He further explained the limitations of cross-racial identification. Moreover, confidence was not an accurate indicator of accuracy.

¶ 52    Dr. Loftus explained that eyewitness experts should not judge whether a particular witness's memory is correct but should provide information about the scientific bases of perception and memory. The trier of fact can use this information to assess an eyewitness's reliability. While Dr. Loftus did not opine as to whether Parker's identification was correct, he found it was "highly questionable" whether someone in her position would have focused on the various offenders' appearances. As for the lineup identification, her memory that she saw defendant act as an assailant would have been poor at best.

¶ 53    The State filed a motion to dismiss, primarily arguing that defendant had not shown how "a litany of examples of misconduct by Guevara from other dissimilar cases" was relevant to his own case, where there was no claim of specific misconduct. Furthermore, *Brady* did not require the State to disclose information regarding unrelated cases that only individual police officers knew about "where the nexus between the other cases of alleged misconduct and

petitioner's case was not known until years after petitioner's trial." In response, defendant argued that Detective Guevara provided evidence of misconduct in this case when he invoked the fifth amendment.

¶ 54    The trial court granted the State's motion to dismiss, finding that defendant failed to provide an affidavit from anyone alleging coercion by Detective Guevara in this case. In addition, defendant testified that he gave his statement because of Detective Troche's representations, not those of Detective Guevara, and a police report showed that Detective Guevara was off duty at the time of defendant's statement. Furthermore, Detective Guevara had compelling, defensible reasons to invoke the fifth amendment, negating an adverse inference therefrom, because (1) he was being deposed in a different case when asked about the Garcia investigation and (2) "the questions which he was asked *have never been allegations which have ever been made* by any of the persons involved." Moreover, Investigator Valdez's hearsay evidence about Parker's new representations was insufficient and Saltouros's denial of witnessing a lineup was irrelevant, as he did not specifically remember this case.

¶ 55    The court found that "absent a specific claim of misconduct by Guevara in this case," defendant's due process claim failed. In addition, the State did not violate *Brady* by failing to disclose evidence of the detective's misdeeds because if defendant could not have discovered such evidence before trial, the State could not have either. Defendant's actual innocence claim failed for reasons similar to those defeating his due process claim and because Dr. Loftus's report was rife with improper personal opinions. Defendant now appeals.

¶ 56                                         II. Analysis

¶ 57    At the second stage of proceedings under the Act, a defendant must make a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 33. This showing is greater than that required to obtain leave to file a successive petition. *People v. Robinson*, 2020 IL 123849, ¶ 43. In addition, the State may file a motion to dismiss or an answer to the petition. *People v. Dupree*, 2018 IL 122307, ¶ 28. Yet, courts must take all well-pleaded allegations as true, unless positively rebutted by the trial record. *People v. Sanders*, 2016 IL 118123, ¶ 42. If a defendant satisfies his burden of making a substantial showing, he is entitled to an evidentiary hearing, at which the trial court will assess the credibility and weight of the evidence and resolve any conflicts in the evidence. *Domagala*, 2013 IL 113688, ¶¶ 34-35.

¶ 58    Evidentiary questions are not to be resolved at the second stage, however. *Id.* ¶ 35. The second stage does not call for fact-finding or credibility determinations. *Dupree*, 2018 IL 122307, ¶ 29. Instead, the substantial showing required "is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *Domagala*, 2013 IL 113688, ¶ 35. Dismissal is warranted only when the petition's factual allegations, liberally construed in the defendant's favor and in light of the trial record, fail to make a substantial showing that a constitutional violation occurred. *People v. Coleman*, 183 Ill. 2d 366, 382 (1998). We review the second-stage dismissal of a petition *de novo*. *Dupree*, 2018 IL 122307, ¶ 29.

¶ 59                                    A. Due Process: Police Misconduct

¶ 60        We first address defendant's contention that he made a substantial showing that his right to due process was violated when Detective Guevara steered witnesses to identify him and, with assistance from Detective Troche, engaged in trickery to get him to sign a statement.

¶ 61        It is well settled that "the use of false testimony underlying a conviction is a due process violation." *People v. Washington*, 171 Ill. 2d 475, 487 (1996). Convictions based on witness statements procured through police intimidation or coercion also involve a question of due process. *People v. Jackson*, 2021 IL 124818, ¶ 29. Additionally, a "pervasive pattern of criminal conduct by police officers" is sufficient to reconsider the voluntariness of a confession. (Internal quotation marks omitted.) *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 189.

¶ 62        Evidence of prior police brutality has routinely found to be irrelevant where the defendant offers only generalized allegations of coercive conduct. *People v. Patterson*, 192 Ill. 2d 93, 115 (2000). Yet, prior allegations of brutality are admissible where they involved the same officer or officers, involved similar methods of abuse and occurred near the time that the defendant's allegations occurred. *People v. Reyes*, 369 Ill. App. 3d 1, 19 (2006). A series of incidents that spans several years may be relevant to demonstrating a pattern and practice of torture. *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 63. While the similarity of allegations is important, "the test is not one of exact or perfect identity." *Jackson*, 2021 IL 124818, ¶ 34. Moreover, for new evidence to be sufficient to grant a defendant a new trial, the evidence (1) must be of such conclusive character that it will probably change the result on retrial, (2) must be material but not merely cumulative, and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier. *Patterson*, 192 Ill. 2d at 139.

¶ 63        Here, defendant contends that his petition and attached documentation provide numerous examples of situations in which Detective Guevara improperly influenced witnesses around the same time that he interacted with the Rodriguez brothers, Fuentes, Casiano, Parker, and defendant himself.

¶ 64        The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This court has recognized Detective Guevara's well-documented history of influencing and manipulating witnesses. *People v. Gomez*, 2021 IL App (1st) 192020, ¶ 58; *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶¶ 34, 57. The allegations against him span decades and share common threads. *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 18; *People v. Montanez*, 2016 IL App (1st) 133726; *People v. Almodovar*, 2013 IL App (1st) 101476; *Reyes*, 369 Ill. App. 3d at 21. Detective Guevara is a malignant blight on the Chicago Police Department and the judicial system.

¶ 65        Instead, the State maintains that defendant "has provided no allegation or documentation of any misconduct in the present case and the trial record not only shows an absence of any such allegation but also repeated testimony by witnesses rebutting the existence of any such allegation." We disagree.

¶ 66        For some time, Illinois Rule of Evidence 1101(b)(3) (eff. Apr. 8, 2013) has stated that the rules of evidence do not apply to postconviction hearings. *Robinson*, 2020 IL 123849, ¶ 78. Recently, our supreme court stated that the final determination as to whether evidence is admissible cannot be made until after a third stage proceeding. *Id.* ¶ 81. This court has also observed that the Act provides the trial court with wide latitude to receive proof by deposition,

affidavit, oral testimony, or other evidence. *Montanez*, 2016 IL App (1st) 133726, ¶ 23. Thus, the trial court erred when it rejected evidence of Parker's statements, through Investigator Valdez, on the basis of hearsay.

¶ 67    According to Valdez, Parker stated she had witnessed a beating but could not make out the offenders' faces. She stated that, in February 1999, Detective Guevara told her she was required to accompany him to the police station due to the arrest warrant. Similar to her posttrial testimony, Parker said that the detective promised to take care of the warrant if she provided the information he wanted. Parker added that when viewing the lineup, Detective Guevara told her that the offenders who beat Garcia were in the lineup and "that they knew they had the right people because they had searched their apartments and found bloody boots that they had used to stomp the victim." Crucially, Parker stated, "she did not know if John Martinez participated in the beating" but identified him because she saw him in the alley. Parker also believed she would be arrested if she did not identify someone.[5]

¶ 68    The State argues that Parker's allegations did not constitute newly discovered evidence because the matter "was fully explored" at the hearing on the motion for new trial. We find this contention to be entirely disingenuous. Parker's 2016 allegations indisputably add details that were not brought out at the posttrial hearing.

¶ 69    Construing the facts liberally in favor of defendant, as courts must do, this is evidence that Detective Guevara engaged in misconduct *in this case*. It is also evidence that Parker's written pretrial statement, which the trial judge found to be the strongest piece of evidence against defendant, falsely stated that she saw defendant beat Garcia. This is not the only evidence that Detective Guevara engaged in misconduct in this case, however.

¶ 70    A witness may invoke the fifth amendment privilege against self-incrimination in any proceeding, criminal or civil, in which he reasonably believes that the information sought could be used against him later at a criminal proceeding. *Id.* ¶ 31. A court may consider a witness's refusal to testify as evidence of the alleged misconduct so long as some evidence supports the complainant's allegations. *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 85. Additionally, the trial court does not have unfettered discretion to decline to draw an adverse inference, particularly if the trial court lacks a good reason for doing so. *Id.* ¶ 86.

¶ 71    Here, we find that the trial court erred by disregarding Detective Guevara's invocation of the fifth amendment with respect to the Garcia murder. We reiterate that the evidence at this stage is to be liberally construed in favor of defendant. Additionally, the trial court lacked a good reason for declining to draw an adverse inference.

¶ 72    We are not persuaded that an adverse inference is unwarranted merely because Detective Guevara was testifying in a different case when asked about his investigation of Garcia's murder or because "the questions which he was asked *have never been allegations which have ever been made* by any of the persons involved." (Emphasis in original.) It remains true that Detective Guevara could not invoke the fifth amendment unless he reasonably believed it could be used against him later, regardless of what proceeding he happened to be testifying in when questioned and regardless of whether anyone had yet accused him of misconduct in the Garcia

---

[5]While Parker suggested that Investigator Valdez and defense counsel would be required to give her monetary compensation to get her to sign an affidavit, this was not the only instance of Parker demonstrating reluctance to participate in this case. The court was required to issue a warrant for Parker's arrest to secure her testimony at a hearing on defendant's motion for a new trial.

case. We find the court erred by failing to allow a negative inference. See *Montanez*, 2016 IL App (1st) 133726, ¶ 31 (finding the postconviction judge failed to consider drawing an adverse inference from Detective Guevara's invocation of the fifth amendment at the postconviction hearing); see also *Wilson*, 2019 IL App (1st) 181486, ¶ 66 (stating that "the decision of government actors to invoke their fifth amendment privilege against self-incrimination is judicially deafening under the facts of this morbid tale of improper law enforcement"); *cf. Gonzalez*, 2016 IL App (1st) 141660, ¶ 61 (declining to accept Detective Guevara's invocation of the fifth amendment in *Rivera v. Guevara*, 319 F. Supp. 3d 1004 (N.D. Ill. 2018), as evidence of his misconduct where the defendant failed to include the transcript with his postconviction petition).

¶ 73    Based on the specific questions asked of him in *Guevara*, 319 F. Supp. 3d 1004, Detective Guevara's invocation of the fifth amendment provides the following evidence of misconduct with respect to *this case*. Detective Guevara fabricated evidence, falsified police reports, withheld exculpatory evidence, manipulated witness identifications and live lineups, and performed unduly suggestive photo identifications. He coerced Esteban, Fuentes, Casiano, and Parker to falsely testify under oath. He told Esteban to identify defendant in the lineup as one of the people responsible for Garcia's death and gave Esteban details about Garcia's death to make it seem like Esteban had provided them and/or to persuade him to identify defendant as one of the people responsible.

¶ 74    Moreover, Guevara's invocation of the fifth amendment supports an inference that Parker failed to make an identification when first shown photos and expressed an intention not to speak to Detective Guevara. He nonetheless coerced Parker to identify defendant and was determined to get her to do so. He offered her a deal to identify him and told her he would quash her warrant if she did. Additionally, Detective Guevara denied defendant food and drink and coerced him to sign a statement by promising he would not be charged.

¶ 75    In addition to new evidence from Parker and Detective Guevara, Saltouros submitted an affidavit stating that while he did not specifically recall this case, the police had only ever allowed him to attend one lineup. Construing his affidavit liberally in defendant's favor, this supports an inference that the police report was false.

¶ 76    Contrary to the State's assertion and the trial court's findings, defendant's petition clearly presented evidence that Detective Guevara engaged in misconduct in this case.[6] Defendant is entitled to an evidentiary hearing. *Cf. Jackson*, 2021 IL 124818, ¶ 35 (finding the defendant's documents regarding police misconduct did not require further proceedings on his witness intimidation claim where none of the claims against the detectives at issue were for coercion or intimidation of a suspect or witness); *Gonzalez*, 2016 IL App (1st) 141660, ¶¶ 60, 65 (finding the defendant could not "overcome the fact that there are no affidavits, records, or supporting evidence filed in this proceeding evidencing Guevara improperly influenced, coerced, or intimidated any witness or improperly influenced any identification in this case" and stating that had the defendant presented even slight evidence that Guevara had done so "a

---

[6]The record rebuts the State's position that there was no suggestion at trial that Detective Guevara engaged in misconduct. Defense counsel told the court he believed that Esteban and Fuentes "might have had a little help to make their identifications, but it's something that I can't prove." Codefendant Kelly's attorney expressed concern that the detective would blurt out inappropriate information: "And frankly, [in] my experience with Officer Guevara, he might do that."

convincing argument would have been made to advance respondent's petition to a third-stage evidentiary hearing").

¶ 77    The State argues that defendant's reliance on inconsistencies between Detective Guevara's testimony and reports on one hand, and other witnesses' testimony on the other, were not themselves newly discovered or conclusive. Yet, having already determined that other evidence warrants an evidentiary hearing, we find that the trial court should consider that evidence as well in seeing that justice is done.

¶ 78    We also reject the State's assertion that the trial record rebuts defendant's assertion that misconduct occurred. Evidence is not positively rebutted merely because it is contradicted by trial evidence. *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 31. Instead, the trial record must clearly show that no trier of fact could ever accept the truth of the new evidence, such as where it is affirmatively and incontestably shown to be false or impossible. *Robinson*, 2020 IL 123849, ¶ 60.

¶ 79    The State argues that Parker testified at the posttrial hearing that Detective Guevara did not pressure her to make an identification due to the arrest warrant and that she gave her statement because it reflected what she witnessed. In addition, Fuentes and Esteban testified at trial that they made identifications based on what they had seen and that no one told them who to identify. The trial record merely conflicts with defendant's new evidence. See *id.* ¶ 57 (stating with respect to leave to file a successive petition that if new evidence of innocence does not contradict trial evidence, filing the petition would be pointless). These inconsistencies join many others already appearing in this case.

¶ 80    Moreover, defendant's assertion that Detective Guevara's alleged misconduct here bears many similarities to his misconduct in other cases is well taken. Defendant observes that the detective's misconduct in other cases included omitting key information from police reports, pointing out suspects during photo array and lineup identifications, telling witnesses who to name in murder investigations, threatening to charge the witness with the crime or otherwise make his life difficult if he did not comply with the detective's directions, and feeding witnesses false information to convince them to make false identifications. This is also not the first time Detective Guevara was alleged to have promised a witness leniency for his own conduct in exchange for providing evidence against a defendant. *Serrano*, 2016 IL App (1st) 133493, ¶ 11. In addition, defendant cites cases where Detective Guevara made false promises to suspects that they would go home if they signed a statement and notes that the detective's tactics also included sleep deprivation and the manipulation of non-English speakers. *Id.* ¶ 33; *Montanez*, 2016 IL App (1st) 133726, ¶ 34. His toolbox of coercion was well stocked with a wide variety of tools. Moreover, many of these instances occurred in the 90s and early 2000s, near the time that the detective investigated Garcia's murder. Thus, evidence of Detective Guevara's misdeeds in other cases would clearly be admissible in this case to show a pattern and practice of misconduct. *Almodovar*, 2013 IL App (1st) 101476, ¶ 68 (finding "the credibility of Detective Guevara is directly at issue with regard to the crucial question of how he procured the evidence that led to defendant's conviction").

¶ 81    The State does not dispute that defendant with the exercise of due diligence could not have discovered such evidence sooner. Instead, the State argues that this evidence is not material or of such a conclusive character that it would probably change the result on retrial.

¶ 82    The trial judge essentially dismissed the testimony and identification of Fuentes and Esteban as problematic. Casiano contributed little if anything to the State's case. The State's

key witness was Parker or, to be more precise, her written statement since her memory was supposedly unreliable by the time of trial. With new evidence that (1) Parker did not see the offenders' faces or know if defendant participated in the beating, (2) she went to the police station because of the arrest warrant, (3) she believed she would be arrested if she did not identify someone, (4) she was told by Detective Guevara that the police found bloody boots used to stomp the victim, and (5) the same detective had a pattern and practice of manipulating witness identification in the manner discussed above, a trier of fact may very well find that Parker's written statement is not credible. See *Serrano*, 2016 IL App (1st) 133493, ¶ 26 (stating that recantations should not be dismissed without analysis, particular where the court is required to view the evidence in the light most favorable to the defendant).

¶ 83 Without that, all that remains is defendant's uncorroborated statement, a statement that he disavowed at trial and disavows now. *Cf. People v. Upshaw*, 2017 IL App (1st) 151405, ¶¶ 79-80 (finding the newly discovered evidence was not so conclusive that it would probably alter the result on retrial where such evidence described misconduct by two particular detectives who the defendant did not specifically claim to be the detectives who abused him and who were off duty for many hours before the defendant gave his statement, and where the defendant alleged very different forms of abuse).

¶ 84 To be sure, defendant testified at trial that Detective Troche, rather than Detective Guevara, told him he would be used as a witness and go home if he made a statement. Yet, Detective Guevara himself declined from the witness stand to deny engaging in misconduct with respect to defendant. Without Parker, a trier of fact could very well find defendant's testimony that he came upon the victim after the attack had concluded was more credible than his statement given after spending two days at the police station with a questionable amount of food and sleep. See *Montanez*, 2016 IL App (1st) 133726, ¶ 30 (finding that "[w]ithout Vicente's trial testimony, even the judge that presided over the trial would disagree" with the postconviction judge's characterization of the other evidence as overwhelming, as the trial judge stated, " 'there wouldn't have been much evidence here' " without Vicente's testimony); see also *People v. Wrice*, 2012 IL 111860, ¶¶ 53-54 (observing that a defendant's assertion that he did not confess does not prevent him from arguing alternatively that any confession should be suppressed).

¶ 85 Defendant has made a substantial showing that his conviction rested on false evidence procured by police misconduct, in violation of due process. He is entitled to an evidentiary hearing.

¶ 86 B. Due Process: *Brady*

¶ 87 Next, defendant asserts that the State violated *Brady* by failing to disclose evidence of Detective Guevara's misconduct.

¶ 88 Under *Brady*, the State has an affirmative duty in criminal prosecutions to disclose evidence favorable to the defendant. *Coleman*, 183 Ill. 2d at 392. In addition, the use of false evidence violates constitutionally mandated disclosure requirements. *Id.* at 391-92. To obtain relief under *Brady*, a defendant must show that (1) the undisclosed evidence is favorable to the defendant because it is exculpatory or impeaching, (2) the State willfully or inadvertently suppressed the evidence, and (3) this suppression prejudiced the defendant because the evidence was material to guilt or punishment. *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). The purpose of *Brady* is not to punish society for the prosecutor's misdeeds but to ensure that

the defendant received a fair trial and to protect the administration of justice. *People v. Hobley*, 182 Ill. 2d 404, 432 (1998).

¶ 89　　In *Hobley*, the Illinois Supreme Court, relying on the United States Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), recognized that "the law is well settled that the same *Brady* rules apply even where the suppressed evidence was known only to police investigators and not to the prosecutor." *Hobley*, 182 Ill. 2d at 438. Additionally, " 'any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.' " *Id.* at 433 (quoting *Kyles*, 514 U.S. at 438). Instead, *Brady* imposes a duty upon prosecutors to learn of evidence known to the police and other government actors. *Beaman*, 229 Ill. 2d at 73 (citing *Kyles*, 514 U.S. at 437). The United States Supreme Court has repeated these principles. See *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006).

¶ 90　　On appeal, the State argues that "the only way petitioner can *** claim that the State should have disclosed this evidence is by imputing knowledge to the State from Detective Guevara himself." At first blush, this seems to be precisely what *Brady* jurisprudence requires us to do, regardless of whether evidence is memorialized in writing or not.

¶ 91　　The Illinois Supreme Court, however, has found that no *Brady* violation occurs where the documents setting forth police misconduct, misconduct that was at a minimum known to the police officers themselves, did not exist at the time of the defendant's trial. See *People v. Mahaffey*, 194 Ill. 2d 154, 173-74 (2000), *overruled on other grounds by Wrice*, 2012 IL 111860; *People v. Orange*, 195 Ill. 2d 437, 457 (2001) (following *Mahaffey*).

¶ 92　　In *Mahaffey*, the court stated:

> "[T[he evidence presented by defendant in support of his claims indicates that any apparent nexus between alleged incidents of abuse of other suspects by Area 2 officers and defendant's claims did not arise until several years after defendant's suppression motion, and it was only at that later time that investigations were initiated into interrogation practices at Area 2. Therefore, defendant cannot properly claim that the State violated the *Brady* rule by failing to disclose information that was unavailable at the time of the suppression proceedings." *Mahaffey*, 194 Ill. 2d at 174.

Shortly thereafter, in *Orange*, the court stated:

> "We do not believe that, under the facts of the present case, the rule in *Brady* requires the prosecution to disclose information about misconduct in unrelated cases known only to individual police officers where the nexus between the other cases of alleged abuse and the defendant's case was not known until years after the defendant's trial." *Orange*, 195 Ill. 2d at 458.

The appellate court has repeatedly followed *Orange* and *Mahaffey*. See *Tyler*, 2015 IL App (1st) 123470, ¶ 211; see also *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 72 (stating that "[w]hile we do not see how to reconcile *Orange* and *Mahaffey* with *Kyles*, we recognize that our supreme court believed its holding in *Orange* did not conflict with *Kyles*").

¶ 93　　Based on *Orange* and *Mahaffey*, defendant has not made a substantial showing that the State violated due process as set forth in *Brady* with respect to instances of misconduct for which no documentation existed at the time of defendant's trial. Defendant has, however, identified documentation that did exist prior to his trial.

¶ 94 An OPS report dated January 1987 sustained charges that Detective Guevara had made a false report. Defendant also attached a transcript in which a witness testified that in 1986, Detective Guevara pulled the witness's car over, verbally abused him, displayed a police badge, struck the witness, and ultimately choked him. The witness was arrested and charged with battery for fighting back. Additionally, OPS disciplined Detective Guevara for that event in 1986. Defendant has identified no other incidents of misconduct that were documented at the time of defendant's trial, however.

¶ 95 Defendant has not made a substantial showing that evidence of those incidents was material. As defendant acknowledges, evidence is material where a reasonable probability exists that the outcome of the proceeding would have been different had such evidence been disclosed. *Beaman*, 229 Ill. 2d at 74. Unlike the present case, however, those instances involved physical violence. Notwithstanding their appalling nature, instances of physical violence are unlikely to convince a trier of fact that Parker made false accusations against defendant upon threat of arrest. Such evidence is similarly unlikely to convince a trier of fact that defendant signed a statement because Detective Guevara deprived him of food or because the detective's partner promised defendant he would be used as a witness and permitted to go home. Accordingly, we cannot say the trial court erred by dismissing defendant's *Brady* claim.

¶ 96 C. Due Process: Actual Innocence

¶ 97 Finally, defendant has made a substantial showing of actual innocence. In order to reach that determination, we must first address a procedural hurdle mentioned by the State in passing and not addressed by defendant whatsoever.

¶ 98 A freestanding claim of innocence is not cognizable under the federal due process clause. *Washington*, 171 Ill. 2d at 482 (citing *Herrera v. Collins*, 506 U.S. 390, 407-08 (1993)). Instead, federal due process recognizes only gateway actual innocence claims, which are not themselves constitutional claims but are the "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404.

¶ 99 In *Washington*, the Illinois Supreme Court found that newly discovered evidence indicating that a defendant is actually innocent, *i.e.*, a freestanding actual innocence claim, presents a cognizable claim as a matter of Illinois due process. *Washington*, 171 Ill. 2d at 487-89. To ignore a freestanding actual innocence claim would be fundamentally unfair and would shock the conscience. *Id.* at 487-88. *Washington* "explicitly rejected the notion that a defendant must be viewed as guilty absent a constitutional error in the underlying proceedings." *People v. Reed*, 2020 IL 124940, ¶ 30. Thus, an actual innocence claim, "does not depend on—and is separate from—a challenge to the sufficiency of the evidence or an allegation of error in the court below." *Id.* ¶ 29. Stated differently, *Washington* recognized a type of innocence claim that was not required to rely on an underlying assertion that some other constitutional violation occurred at trial. As applied to the case before it, the supreme court stated that "unlike the ineffective-assistance claim supported by Martin's testimony, the newly discovered evidence is not being used to supplement an assertion of a constitutional violation with respect to his trial." *Washington*, 171 Ill. 2d at 479.

¶ 100 Two years after *Washington*, however, the Illinois Supreme Court's decision in *Hobley* took on a much different tone. Whereas *Washington* held that a defendant was *not required* to rely on an underlying constitutional claim to assert actual innocence, *Hobley* found that the

- 17 -

defendant was *not allowed* to rely on the same evidence to pursue both a constitutional claim of trial error and a freestanding actual innocence claim, even if the defendant wanted to rely on the same evidence for both claims.

¶ 101    Relying on *Washington*, *Hobley* found that a freestanding innocence claim exists when the newly discovered evidence relied on therefor is not also used to support a constitutional claim of trial error. *Hobley*, 182 Ill. 2d at 444. Because the court had already determined that the State's actions regarding certain evidence was sufficient to proceed to a third-stage evidentiary hearing on the defendant's *Brady* claim, the same evidence did not support a freestanding actual innocence claim. *Id.* Illinois courts have followed this principle on several occasions. See, *e.g.*, *Orange*, 195 Ill. 2d at 460; *Gonzalez*, 2016 IL App (1st) 141660, ¶¶ 29-30 (finding that the defendant was impermissibly relying on evidence of Detective Guevara's misconduct in other cases to support both his *Brady* claim and his actual innocence claim); *People v. English*, 403 Ill. App. 3d 121, 132 (2010) (stating that "[a] claim of innocence must be based on newly discovered evidence that establishes the defendant's innocence rather than merely supplementing an assertion of a constitutional violation with respect to trial"); *People v. Collier*, 387 Ill. App. 3d 630, 637 (2008), *overruled on other grounds by Robinson*, 2020 IL 123849.

¶ 102    It would seem that the decision in *Hobley* attempted to track *Washington*'s application of the law, but in doing so, deviated from both the spirit and the letter of the law as set forth in *Washington*. *Hobley* identified no principle or purpose that would be furthered by prohibiting a defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim. Furthermore, the *Hobley* rule would potentially force a defendant to choose to forgo a meritorious claim of trial error in order to pursue an actual innocence claim.

¶ 103    Arguably, the *Hobley* rule *may* serve a purpose where a defendant seeking leave to file a successive postconviction petition asserts actual innocence to circumvent the cause-and-prejudice test that applies when determining whether a defendant is entitled to leave to file a successive petition. See *People v. Coleman*, 2013 IL 113307, ¶¶ 83-84 (stating that a defendant may assert an actual innocence claim without showing cause and prejudice). That being said, both *Hobley* and the case before us involve the second stage. Compare *People v. Jackson*, 2018 IL App (1st) 171773, ¶ 71, *aff'd on other grounds*, 2021 IL 124818 (following *Hobley*), with *Jackson*, 2018 IL App (1st) 171773, ¶¶ 118-19 (Mikva, J., dissenting) (disagreeing with the determination that the defendant's freestanding actual innocence claim failed on the basis that "the evidence was not presented as a wholly independent basis establishing the defendant's innocence but to supplement a due process claim" and stating that a freestanding actual innocence claim is "a decidedly good thing" that allows petitioners to bring claims even when they cannot demonstrate that a due process error occurred at trial (emphasis omitted)).

¶ 104    We also find *Hobley*'s rule to be inconsistent with the Illinois Supreme Court's more recent pronouncements on actual innocence. In *Coleman*, the supreme court, discussing *Herrera*, stated that "a freestanding actual-innocence claim is independent of any claims of constitutional error at trial and focuses solely on a defendant's factual innocence in light of new evidence." *Coleman*, 2013 IL 113307, ¶ 83. Thus, *Coleman*'s explanation of a freestanding actual innocence claim contemplates that the *claims* be independent, not that the actual innocence claim be independent of *the evidence* underlying his other constitutional claim or trial error.

¶ 105    The supreme court further stated in *Coleman* that "[p]rocedurally, a trial court should treat [a freestanding actual innocence] claim like any other postconviction claim." *Id.* ¶ 84. Substantively, a court should grant relief if the defendant has presented evidence that is (1) new, (2) material, (3) noncumulative, and (4) so conclusive that it would probably change the result on retrial. *Id.* Yet, *Hobley* effectively imposes a fifth requirement: that the evidence underlying the actual innocence claim not be used to support any other constitutional claim. See also *Reed*, 2020 IL 124940, ¶ 19 (reiterating that " '[i]mprisonment of the innocent would *** be so conscience shocking as to trigger operation of substantive due process' " (quoting *Washington*, 171 Ill. 2d at 487-88)).

¶ 106    We find that *Hobley*'s fifth requirement for raising an actual innocence claim cannot be reconciled with our supreme court's more recent postconviction jurisprudence. *Coleman*, 2013 IL 113307, ¶¶ 83-84; see also *Serrano*, 2016 IL App (1st) 133493, ¶ 47 (allowing the defendant to pursue both actual innocence and *Brady* claims based on Detective Guevara's misconduct). Even if *Hobley*'s rule remains good law, we find that it does not preclude defendant's actual innocence claim here, where that claim relies on evidence in addition to that underlying his claims based on police misconduct and *Brady*. Specifically, defendant relies on the report of Dr. Loftus. Our supreme court considered a very similar report of Dr. Loftus in *People v. Lerma*, 2016 IL 118496.

¶ 107    There, our supreme court recognized that it had not addressed the admission of eyewitness expert testimony since *People v. Enis*, 139 Ill. 2d 264 (1990), decided more than 25 years earlier. *Lerma*, 2016 IL 118496, ¶ 24. In *Enis*, the supreme court expressed skepticism and caution about the overuse of expert testimony on eyewitness identification, while also recognizing that some courts had found it to be admissible under certain circumstances. *Enis*, 139 Ill. 2d at 286-87. This led to the common practice of excluding such testimony. *Lerma*, 2016 IL 118496, ¶ 24.

¶ 108    In the time since *Enis*, however, expert testimony regarding eyewitness reliability has become widely accepted by both courts and scientists and involves findings unfamiliar and potentially counterintuitive to the average person. *Id.* We have seen that identifications are sometimes not as reliable as they seem. *Id.* Unlike the supreme court's statements in *Enis,* the court was able to recognize in *Lerma* that the research is well settled and well supported. *Id.*

¶ 109    Like the report here, Dr. Loftus's report in *Lerma* said he would not opine as to whether a particular witness's memory or assertions were correct or incorrect. *Id.* ¶ 14. Additionally, Dr. Loftus stated that an identification of a suspect with whom the witness is acquainted is not necessarily accurate, particularly in poor viewing conditions. *Id.* Furthermore, cross-racial identification could negatively impact accuracy. *Id.* Dr. Loftus's report in *Lerma* provided substantially the same information that his report provided in this case.

¶ 110    The supreme court found the trial court abused its discretion in excluding Dr. Loftus's testimony because eyewitness identifications were the only evidence of the defendant's guilt and Dr. Loftus had identified several factors that could potentially reduce the reliability of the eyewitness testimony before it. Moreover, the witnesses' identifications were not presumptively reliable merely because they knew the defendant. Under the circumstances, expert eyewitness testimony would have been both probative and admissible. *Id.* ¶ 26.

¶ 111    Defendant acknowledges that at least one decision of this court found that *Lerma* does not apply retroactively. *People v. Brown*, 2020 IL App (1st) 190828, ¶ 53. In the context of an actual innocence claim, however, we are called upon to evaluate how a trier of fact might assess

new evidence now, not whether the court erred in the past. We must apply the rule prospectively, not retroactively, in this instance. *Cf. id.* ¶ 25 (finding *Lerma* did not assist the defendant's claim that the trial court violated his due process rights by excluding testimony from an expert on identification at trial). We find *Brown* to be distinguishable.

¶ 112    We further reject the State's assertion that Dr. Loftus's report cannot be considered because it contains his personal opinions. We find no meaningful difference between the quality of the proposed expert testimony in *Lerma* and the quality of the same here. Even if portions of the report would be inadmissible, that would not justify disregarding the report in its entirety. See also *People v. Johnson*, 327 Ill. App. 3d 203, 210 (2001) (setting forth the presumption that a trial judge will consider only competent evidence). Additionally, we reiterate that the rules of evidence do not apply to postconviction proceedings. See *Robinson*, 2020 IL 123849, ¶ 78.

¶ 113    Moreover, the State makes the somewhat disingenuous argument that Dr. Loftus's report does not constitute newly discovered evidence because expert testimony on eyewitness identification predates defendant's conviction. The State has clearly missed the thrust of *Lerma*. The tone set by *Enis*, which was in effect at the time of defendant's trial, resulted in the common exclusion of expert testimony on eyewitness identification. It would have done little good for defendant to procure Dr. Loftus' report at the time of trial.

¶ 114    Finally, we reject the State's assertion that this new evidence is not of a sufficiently conclusive nature to qualify as actual innocence. Conclusive means that when considered alongside the trial evidence, the new evidence probably would lead to a different result. *Id.* ¶ 47. Conclusiveness is the most important element of actual innocence. *Sanders*, 2016 IL 118123, ¶ 47. To advance to a third-stage evidentiary hearing on an actual innocence claim, the defendant must make a substantial showing that it is more likely than not that no reasonable trier of fact would find him guilty beyond a reasonable doubt. *Id.*

¶ 115    That being said, probability, not certainty, is the key in considering conclusiveness. *Coleman*, 2013 IL 113307, ¶ 97. New evidence need not be entirely dispositive for a court to find it is likely to alter the result on retrial. *Robinson*, 2020 IL 123849, ¶ 48. An actual innocence claim does not require a defendant to show total vindication or exoneration. *Id.* ¶ 55. Instead, the ultimate question is whether evidence supporting the petition places the trial evidence in a different light, undermining the court's confidence in the judgment of guilt. *People v. Prante*, 2021 IL App (5th) 200074, ¶ 92.

¶ 116    Here, the trial court found the strongest piece of evidence against defendant was Parker's identification. The court ultimately gave it even more weight than defendant's written statement. Dr. Loftus's testimony would certainly undermine her potential ability to see the scene of the attack. Additionally, her inability to see defendant assault Garcia would strengthen her recent assertion that her pretrial statement was false.

¶ 117    The State nonetheless asserts that the new evidence cannot be of a conclusive character due to defendant's confession. We reiterate that the trial court found the testimony of Esteban and Fuentes to be problematic. If a trier of fact were to find that Parker's written statement was not credible, the only evidence that defendant participated in the attack would be his uncorroborated out of court statement, which he denied making. Under these circumstances, we do not agree that defendant's confession negates his substantial showing that it is more likely than not that no reasonable trier of fact would find him guilty beyond a reasonable doubt. *Sanders*, 2016 IL 118123, ¶ 47. Dr. Loftus's report, particularly when considered with Parker's new representations and Detective Guevara's invocation of the fifth amendment, places the

trial evidence in a different light.

¶ 118                                  III. Conclusion

¶ 119    Defendant has made a substantial showing that Detective Guevara's misconduct violated his right to due process. He has also made a substantial showing of actual innocence. Thus, he is entitled to a third-stage evidentiary hearing. Defendant asks, however, that we remand this case to a different trial judge. See *Montanez*, 2016 IL App (1st) 133726, ¶ 44 (reassigning the case to another judge where "[t]he postconviction court gave the impression that it was flatly unwilling to consider the evidence offered by petitioner" and the defendant would be prejudiced by remanding to the same judge).

¶ 120    In the time since the trial court ruled on defendant's petition, our supreme court issued its decision in *Robinson*, which clarified what evidence a court is to consider in evaluating a defendant's postconviction claims.[7] *Robinson*, 2020 IL 123849, ¶¶ 78, 81. With the benefit of such guidance, we trust that on remand, the trial court will apply the appropriate standards in light of all of the evidence. See *Coleman*, 2013 IL 113307, ¶ 97 (stating that while the trial court makes credibility determinations at a third stage evidentiary hearing on actual innocence, the trial court should not redecide whether the defendant was guilty).

¶ 121    For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

¶ 122    Reversed and remanded.

---

[7]One panel of this court has observed that Illinois Rule of Evidence 1101(b)(3) (eff. Apr. 8, 2013), excluding rules of evidence from postconviction proceedings, conflicts with the requirement that courts consider whether evidence supporting actual innocence claims would probably change the result on retrial. *People v. Shaw*, 2019 IL App (1st) 152994, ¶ 67. Specifically, evidence that would not be admitted at retrial could not actually impact the result of that retrial. Under *Robinson*, courts must adhere to the legal fiction created by the interplay of these rules.