2022 IL App (1st) 200483-U

FIFTH DIVISION
Order filed: January 21, 2022

No. 1-20-0483

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) ) | No. 96 CR 18502 |
| LOUIS ROBINSON, | ) ) ) | Honorable Domenica A. Stephenson, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**ORDER**

¶ 1 *Held*: We reverse the circuit court's summary dismissal of the defendant's postconviction petition, finding that he stated an arguable claim of actual innocence.

¶ 2 The defendant, Louis Robinson, appeals from an order of the circuit court of Cook County summarily dismissing his petition for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-2 *et seq.* (West 2018)). On appeal, he contends that the circuit court erred in dismissing his petition because he stated arguable claims of actual innocence and ineffective

assistance of trial counsel. For the reasons that follow, we reverse and remand for second-stage proceedings under the Act.

¶ 3 The defendant was charged by indictment with, *inter alia*, two counts of first-degree murder and two counts of aggravated discharge of a firearm stemming from the June 20, 1996 drive-by shooting that killed Kelly Velez.

¶ 4 Following a 1997 bench trial, the defendant was found guilty of first-degree murder and aggravated discharge of a firearm. The evidence presented at trial established that the defendant, while driving a maroon-colored car, fired his gun at a group of people who were congregating in the parking lot of a gas station near the intersection of Kedzie and Barry. Velez, who was at the gas station meeting her boyfriend Oscar Betancourt, was shot and killed.

¶ 5        At trial, the State presented the testimony of three occurrence witnesses: Hilda Carerra, Oscar Betancourt, and Francisco Rocha. The State also presented the testimony of two Chicago Police Officers: Asvaldo Valdez and Caesar Echevarria.

¶ 6 Carerra testified that, on the night of June 20, 1996, she and Velez went to the gas station at 3100 N. Kedzie to meet Betancourt. After parking behind Betancourt in the gas station parking lot, Velez exited the car to talk to him; Carerra stayed in the car. Approximately 15 minutes later, Carerra heard gunshots and ducked down. When the shooting ended, she exited the car and saw that Velez had been shot. She testified that she heard the shots coming from the direction of Kedzie, which was in front of the gas station, but she did not see the shooter.

¶ 7 Betancourt testified that, at approximately 11 p.m. on the night in question, he drove to a gas station on Kedzie to meet Velez. He was accompanied by three friends, all of whom were members of the Maniac Latin Disciples street gang. When Velez arrived at the gas station, she parked her

car behind his and then exited the car to talk with him. Betancourt described the gas station and surrounding area as being well-lit. As he stood outside talking to Velez, he heard "pops," which he thought were fireworks. He turned toward Kedzie, where the sound originated, and saw a "dark black male," whom he identified as the defendant, in a maroon car "with his hand out the window shooting a gun." Betancourt turned toward Velez and noticed that she had fallen to the ground. He then looked back toward Kedzie and saw that the maroon car had stayed in place for a moment before slowly driving away. When Betancourt turned away from Kedzie, he discovered that Velez had been shot and called for help.

¶ 8 Betancourt also testified that, on June 25, 1996, he went to the Area 5 police station where a detective showed him a photo array containing six photographs depicting black males. Betancourt identified the defendant as the shooter from the photo array. Betancourt remained at the police station for the next several hours. Shortly after midnight, he viewed a lineup, and he again identified the defendant as the shooter. On cross examination, Betancourt testified that he did not know the defendant, nor had he ever seen him prior to that evening. He also denied being a member of the Maniac Latin Disciples and denied telling the police otherwise.

¶ 9 Francisco Rocha, who was inside an apartment near Kedzie and Barry when the shooting occurred, also testified. According to Rocha, at around 11:15 p.m., he heard several gunshots coming from outside his apartment. He looked out a window and saw a maroon car driving slowly on Kedzie. He saw the driver of the car "bringing his left arm in the car" as he drove away. Rocha described the driver of the car as either a "Hispanic" or "light-complected black man" who was wearing a dark colored tank top and a small medallion on a gold chain necklace. He heard a man cry out that someone had been shot and saw a young woman lying on the ground. On

crossexamination, Rocha testified that it was dark out and that he never saw the face of the person in the car. He also did not remember if there were other people in the car. Rocha acknowledged that he viewed a lineup about a week after the shooting and that he was unable to identify anyone from the lineup as the shooter.

¶ 10 Officer Caesar Echeverria testified that he created the photo array shown to Betancourt. Officer Echevarria stated that he was familiar with the Maniac Latin Disciples, its hierarchy, factions, and internal conflicts at the time. According to Officer Echeverria, at the time of the shooting, the Talman-Wabansia faction of the Manic Latin Disciples was in conflict with the Kedzie-Barry faction of the gang. Officer Echeverria explained that he looked at photographs of known members of the Talman-Wabansia faction because some of its members were black, as the shooter had been described. After viewing the photos, Officer Echevarria suspected that the defendant was involved in Velez's murder for the following reasons: (1) Talman-Wabansia was in open warfare with Kedzie-Barry; (2) Velez had been in Kedzie-Barry territory when she was shot; (3) sometime earlier on the same evening as Velez's murder, a man named Rogelio Barnes had been shot in Talman-Wabansia territory; and (4) the defendant, who was Barnes's cousin, was an "enforcer" in the Talman-Wabansia faction. Based on his suspicions, Officer Echevarria included the defendant's photograph in the array.

¶ 11 Officer Asvaldo Valdez testified that he arrested the defendant on June 26, 1996, after Betancourt identified him in a photo array. Officer Valdez stated that the defendant was wearing a medallion and gold jewelry when he was arrested.

¶ 12 The parties stipulated to the testimony of Assistant State's Attorney Robert Heilingoetter, who was working in the felony review unit on June 26, 1996. If called, Heilingoetter would testify that,

at approximately 3 a.m., he was with Chicago Police Detective Reynaldo Guevara at the Grand and Central police station. He advised the defendant of his *Miranda* rights, and the defendant agreed to give a statement. The defendant told Heilingoetter that, at approximately 10:40 p.m. on June 20, 1996, he was with his cousin, Rogelio Barnes, at 1800 North Washtenaw Avenue when Barnes was shot. After the shooting, the defendant went to put air in his car tire and then went to his grandmother's house, where he encountered Barnes's father and an individual named Beaver. The defendant, Barnes's father, and Beaver then went to St. Elizabeth's Hospital to visit Barnes. Afterwards, the defendant went to get his tire fixed before going to his girlfriend's house, where he spent the night.

¶ 13 Officer Kristine Carabello testified that, on June 20, 1996, she was assigned to investigate a shooting that occurred at 1800 North Washtenaw. As part of her investigation, she canvassed local hospitals searching for the victim. Officer Carabello first went to St. Mary's Hospital where she was approached by a black male, whom she later identified as the defendant, who told her: "My cousin is not here." Officer Carabello observed that the defendant was wearing a gold chain with a medallion in the shape of a machine gun. After confirming that the victim was not at St. Mary's Hospital, Officer Carabello went to St. Elizabeth's Hospital. There, she learned that the victim was being treated and that his name was Rogelio Barnes. While at the hospital conducting her interview with Barnes, Officer Carabello heard over the radio that there had been a shooting in the 3000 block of Kedzie. Officer Carabello testified that she did not see the defendant while she was at St. Elizabeth's. Officer Carabello also testified that, on June 25, 1996, she saw the defendant at Area 5 and that he was wearing the same gold medallion and chain he had been wearing when she saw him at St. Mary's Hospital. The State then rested.

¶ 14 The defense presented the stipulated testimony of Detective Joseph Mohan. The parties stipulated that, if called to testify, Detective Mohan would have testified that he interviewed Betancourt in the early morning hours on June 21, 1996, and that Betancourt admitted to being a member of the Maniac Latin Disciples.

¶ 15 At the close of evidence, the circuit court found the defendant guilty of first-degree murder and aggravated discharge of a firearm. In announcing its decision, the court state that Betancourt's testimony was the "linchpin" and that it found his testimony credible. The court described the other witnesses as "creat[ing] the fabric around which Mr. Betancourt's testimony could sit." Following a sentencing hearing, the court sentenced the defendant to concurrent prison terms of 60 years for first-degree murder and 15 years for aggravated discharge of a firearm. The defendant filed a direct appeal, and this court affirmed the defendant's conviction. See *People v. Robinson*, 316 Ill. App. 3d 1292 (2000) (unpublished order under Supreme Court Rule 23).

¶ 16 On October 22, 2019, the defendant filed a *pro se* postconviction petition pursuant to the Act. In his petition, the defendant argued, *inter alia*, that his trial counsel was ineffective for failing to investigate whether detectives coerced Betancourt to falsely identify him during the lineup. According to the defendant, when it was his turn to stand up for the lineup, he heard conversations on the other side of the one-way glass window. He first heard a detective, whom he believed was Detective Guevara, ask, "is that him," to which someone else responded, "that's not him." He then heard unidentified "detectives" say the following: "[I]f you don't say that's him, we're going to give you the murder because we think they was trying to kill you. So far as we're concern[ed], you're the reason why your girlfriend is dead." The defendant told the person on the other side of the glass, "please, don't do that." Shortly thereafter, an officer came into the lineup room and told

the defendant he was formally under arrest. The defendant alleged that he told his trial counsel what transpired during the lineup and encouraged him to investigate the matter, but his trial counsel declined to do so because he did not believe the defendant's story.

¶ 17 The defendant explained in his petition that he was unaware of Detective Guevara's history of misconduct until he read an article from May 5, 2017, "confirming that [Detective] Guevara often used the tactics [he] used on [Bentancourt]." The defendant then met a fellow inmate, Anthony Jones, who told him that he was also a victim of Detective Guevara's misconduct and shared with the defendant "a litany of articles and other documents" regarding Detective Guevara tactics. After obtaining this information, the defendant contacted his trial counsel and told him about what he had learned. His counsel, who had since retired, apologized for not pursuing his claim when he still represented him. Counsel advised him to contact assistant public defender Harold J. Winston for assistance. The defendant contacted Winston who instructed him to file a *pro se* postconviction petition.

¶ 18 The defendant attached the following documents in support of his petition: his own signed and notarized affidavit; three pages of a Chicago Police Department Supplementary Report, dated June 21, 1996; and a copy of the letter he received from Assistant Public Defender Winston advising him to file a postconviction petition. In his affidavit, the defendant stated he attempted to obtain an affidavit from his trial counsel, but his counsel refused. He also averred that the facts alleged in his petition were "true and correct." The police report attached to the defendant's petition contained the initial statements Rocha and Betancourt provided to police. The report reflects that Rocha described the driver of the maroon car as "a M/Wh with a dark complexion or a light skinned

M/B," whereas Betancourt described the shooter "as a dark complected male black Hispanic in his early twenties."

¶ 19 The circuit court dismissed the defendant's postconviction petition on January 17, 2020, finding that his claims were frivolous or patently without merit. Regarding the defendant's claim that his counsel was ineffective for failing to investigate the allegations of coercion during the lineup, the court found that the defendant failed to support his claim with affidavits from the other men present during the lineup or explain the absence of said affidavits, as required by the Act. As to the defendant's more general claim that his trial counsel should have investigated Detective Guevara or other detectives for possible misconduct, the court found that, at the time he related this information to his counsel, his allegations were entirely uncorroborated, and therefore his counsel was not arguably deficient for failing to investigate them. The court also noted that it was factually and legally irrelevant whether the defendant's trial counsel subsequently apologized to the defendant for failing to investigate those matters because the reasonableness of counsel's conduct is measured from his perspective at trial, not in hindsight.

¶ 20 The court next addressed the allegations that the defendant was denied a right to a fair trial because of police misconduct. After first acknowledging the issue was not "explicitly" plead by the defendant, the court denied the claim on the grounds that the allegations were "lacking independent or objective corroboration." The court noted that the defendant did not attach the articles he allegedly read detailing Detective Guevara's abuse or an affidavit from Jones, the inmate who alleged that he was a victim of Detective Guevara's misconduct. The court also noted that the defendant failed to cite to any specific incidents that Detective Guevara is alleged to have committed in other cases; failed to show that those other instances were similar to the misconduct

alleged in his case; submitted no evidence that the detectives named in the petition had been present at the lineup or had interviewed Betancourt; or that he or other witnesses, including Betancourt, had ever accused the detectives, during or since trial, of coercing Betancourt into identifying the defendant as the perpitrator. This appeal followed.

¶ 21 On appeal, the defendant raises two arguments in support of his contention that the circuit court erred in summarily dismissing his petition. First, he argues that his petition stated an arguable claim of actual innocence based on newly discovered evidence of Detective Guevara's pattern and practice of coercing witnesses in identification procedures. His second argument is that his petition stated an arguable claim that his trial counsel was ineffective for failing to investigate whether Betancourt's identification was coerced. We first address whether the defendant stated an arguable claim of actual innocence.

¶ 22 The Act provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights in the proceedings which resulted in his conviction. 725 ILCS 5/122-1 (West 2012). At the first stage of a postconviction proceeding, the circuit court independently reviews the defendant's petition, taking the allegations as true, and determines if it is frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). Our supreme court has held that a petition may be summarily dismissed as frivolous or patently without merit if it has "no arguable basis either in law or in fact." *Id.* at 16. A petition lacks such an arguable basis when it is based on fanciful factual allegations or an indisputably meritless legal theory. *Id.* A legal theory that is completely contradicted by the record is indisputably meritless. *Id.* Our review of a first-stage summary dismissal is *de novo. People v. Henderson*, 2011 IL App (1st) 090923, ¶ 19. ¶

23 The defendant's first contention on appeal is that he stated an arguable claim of actual innocence based on newly discovered evidence of Detective Guevara's pattern of misconduct.

¶ 24 An actual innocence claim is cognizable under the Act because the conviction of an innocent person violates the due process clause of the Illinois Constitution. *People v. Washington*, 171 Ill. 2d 475, 489 (1996); see also *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009) ("The due process clause of the Illinois Constitution affords postconviction defendants the right to assert a freestanding claim of actual innocence based on newly discovered evidence."). To establish a claim of actual innocence at the first stage of postconviction proceedings, the defendant was required to show that the supporting evidence was arguably: (1) newly discovered; (2) material and not cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶¶ 47-48.

¶ 25 The defendant acknowledges his allegation that Betancourt was coerced into falsely identifying him was known to him and his trial counsel prior to trial; therefore, it is not newly discovered. However, he maintains that he could not raise the issue earlier because he did not have evidence to support his claim until recently when he read a May 5, 2017 article regarding Detective Guevara's prior misconduct and then met a fellow inmate who had additional articles and documents relating to Detective Guevara's misconduct. According to the defendant, this evidence should be considered newly discovered because evidence of Detective Guevara's pattern and practice of misconduct was not reasonably available to him at the time of his 1997 trial. He also contends that the evidence is material, noncumulative, and of such a conclusive character that it would probably change the result on retrial given that Bentancourt's identification was the "linchpin" to securing his conviction.

¶ 26 At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct, including influencing witnesses to obtain false identifications, nor could it. See, e.g., *People v. Gomez*, 2021 IL App (1st) 192020, ¶ 58 ("This court has recognized that [Detective] Guevara has a history of influencing witnesses."). Indeed, this court recently described Detective Guevara as "a malignant blight on the Chicago Police Department and the judicial system." *People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64. Rather, the State maintains that the defendant's petition should be summarily dismissed because the newly discovered evidence of Detective Guevara's misconduct is not arguably material or so conclusive as to likely change the result on retrial. We disagree.

¶ 27 To begin, we find that the defendant's evidence is newly discovered. New evidence means it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. See *People v. Burrows*, 172 Ill. 2d 169, 180 (1996). According to the defendant's postconviction petition, he related his story of overhearing Detective Guevara coercing Betancourt's identification to his trial counsel, but his counsel did not believe him and chose not to investigate the matter. This left the defendant without any means of corroborating his allegations. However, that changed when he discovered a 2017 news article detailing Detective Guevara's history of misconduct and met Jones, who provided him with additional articles and documents relating to Detective Guevara. We find that the evidence described in the defendant's postconviction petition constitutes newly discovered evidence because there is no reasonable argument that he could have come into possession of that evidence prior to his trial in 1997. See *People v. Reyes*, 369 Ill. App. 3d 1, 20 (2006) (finding that allegations against Detective Guevara could not have been discovered through due diligence prior to the defendant's 2000 trial.).

¶ 28 We next consider whether the evidence is material, which means the evidence is relevant and probative of the defendant's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). Here, we conclude that the evidence is material. As previously mentioned, Detective Guevara's history of misconduct includes allegations that he improperly influenced identifying witnesses. See *Martinez*, 2021 IL App (1st) 190490, ¶ 67 (detailing allegations that Detective Guevara told a witness that the offenders were in the lineup prior to her viewing the lineup and that the witness "believed she would be arrested if she did not identify someone.") At the defendant's trial, the only evidence linking him to Velez's murder was Betancourt's identification of him as the perpetrator. Indeed, the circuit court described Betancourt's testimony as the "linchpin" to securing the defendant's conviction. Certainly, evidence that Betancourt's identification was coerced by a detective with a history of coercing witnesses to obtain convictions would be arguably relevant and probative of the defendant's innocence.

¶ 29 The third element when considering evidence of actual innocence is whether the evidence is noncumulative, meaning that the evidence adds to what the trier of fact heard. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). Here, there can be no question that the trier of fact did not hear any evidence similar to what the defendant described in his postconviction petition. The defendant's theory at trial was that he had been misidentified, not that the police had coerced Betancourt to identify him. Consequently, the evidence is noncumulative.

¶ 30 We turn to the final element of an actual innocence claim—whether it is arguable that the proposed new evidence, when considered along with the trial evidence, would probably lead to a different result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96. At this stage, the defendant's evidence "need not be entirely dispositive" but he must "present evidence that places the trial

evidence in a different light and undermines the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶ 56. Here, we find that the defendant's evidence is arguably so conclusive that it could lead to a different result on retrial. As mentioned, the only evidence connecting the defendant to Velez's murder was Betancourt's identification. Moreover, Rocha's description of the shooter (a Hispanic of light-complected black male), which is the only other description of the shooter presented at trial, did not match the defendant, a dark-complected black male. According to the defendant's postconviction petition, he overheard Betancourt initially refuse to identify him as the perpetrator, followed by detectives, one of whom he identified as Detective Guevara, threatening to charge Betancourt with Velez's murder if he did not identify him (the defendant) as the perpetrator. Taking this allegation as true, as we must at this stage of the proceedings, and given Detective Guevara's documented history of engaging in precisely these types of tactics to obtain convictions, it is more than arguable that this evidence could place the evidence at trial in a different light. Accordingly, we conclude that the defendant has met the required threshold for surviving summary dismissal on his claim of actual innocence.

¶ 31 The State nevertheless contends that the defendant failed to show Detective Guevara was present during his lineup. However, at the first stage of postconviction proceedings, we must accept all allegations in the defendant's petition as true unless rebutted by the record. See *People v. Sanders*, 2016 IL 118123, ¶ 42. Here, there is nothing in the record to rebut the allegation that Detective Guevara was present during the lineup. Moreover, the record contains several references to Detective Guevara, including that he was the arresting detective and that he was "with" ASA Heilingoetter at the Grand and Central police station when the defendant gave Heilingoetter his statement. Notably, the lineup in question occurred shortly after the defendant was arrested.

Accordingly, we must accept as true the defendant's allegation that Detective Guevara was present during the lineup.

¶ 32 For these reasons, we reverse the judgment of the circuit court of Cook County and remand this case with instructions to docket the petition for second-stage proceedings pursuant to the Act. Based on our holding, we need not consider whether the defendant's petition contained an arguable claim of ineffective assistance of trial counsel.

¶ 33     Reversed and remanded with directions.