2022 IL App (1st) 210287-U

No. 1-21-0287

December 27, 2022

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 19667 |
| | ) | |
| DANIEL DANAO, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm the circuit court's dismissal of defendant's successive postconviction petition at the second stage, where defendant failed to make a substantial showing of ineffective assistance of trial counsel or actual innocence.

¶ 2    Defendant Daniel Danao appeals from the circuit court's second-stage dismissal of his successive petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, defendant contends that he made a substantial showing of (1) ineffective assistance of trial counsel where counsel failed to seek gunshot residue (GSR) testing on a

sweatshirt; and (2) actual innocence based on the affidavit of a newly discovered witness and testing results showing no GSR on the sweatshirt. For the following reasons, we affirm.

¶ 3    In July 1999, defendant was charged by indictment with first degree murder for killing Augustine Garza "with a gun."

¶ 4    At trial, Gene Nathaniel testified that around 3:45 a.m. on July 3, 1999, he was at the bus stop on the southwest corner of Sacramento Avenue and 63rd Street in Chicago. Streetlights and lights from the gas station across the street lit the area. Teenagers walked from the gas station to a van parked on the southeast corner. Nathaniel, who had an unobstructed view of the van, heard a "loud pop," and saw a young man wearing a "black hoodie" aim a weapon at a man sitting in the driver's seat of the van. The shooter fired several times and the flare from the weapon lit the shooter's face. Nathaniel identified defendant in court as the shooter. Defendant fired additional shots before running into the alley. Nathaniel spoke with police at the scene and later identified defendant in a lineup at the police station.

¶ 5    On cross-examination, Nathaniel stated that the man with the black hoodie stood "outside the passenger compartment with the weapon aimed inside of the van at the guy who got shot." The van was positioned between Nathaniel and defendant, but Nathaniel observed defendant through the front window "clear as a bell."

¶ 6    Christina Cortes testified that on July 3, 1999, she was a member of the Latin Souls gang. Around 3:15 a.m., she and Garza exited a restaurant near 63rd and Sacramento with six people. Cortes and two others walked to the gas station while the rest of the group, including Garza, walked to the van parked across the street. A "greenish teal" four-door vehicle passed her, and Cortes

identified defendant in court as the passenger in the vehicle. Cortes knew defendant as "Smurfy." The men who were with Cortes "made gang signs," but defendant just "smiled."

¶ 7     After leaving the gas station, Cortes heard three gunshots, a pause, and then more shooting. Defendant, wearing a black hoodie and dark pants, jumped out of the passenger side of the van and ran to the alley. In the van, Cortes saw Garza "shot up" against the driver's side door. Cortes knew defendant's address and accompanied police officers to defendant's house. At the police station, she identified defendant in a lineup as the shooter.

¶ 8     On cross-examination, Cortes stated that she left the Latin Souls after Garza's death. When the shooting occurred, the van's front passenger door was open and defendant "put his body in to do the shooting." Cortes could not see defendant's face as he fired because his body was in the van. However, she got "a good look at him" when he exited the van and glanced at her before running into the alley.

¶ 9     April Gritzenbach testified that she was a member of the Latin Souls in July 1999, but no longer belonged to the gang. Around 3 a.m. on July 3, 1999, she was at a restaurant near Sacramento and 63rd with a group of friends, including Cortes and Garza. Afterwards, Gritzenbach walked with a friend to the gas station approximately 45 feet away. Outside the gas station, Gritzenbach saw a vehicle she did not recognize. She could see the driver and the passenger, but she did not know them. The passenger was "medium complected" with a "bald head" and facial hair. Cortes and others displayed gang signs at the people in the vehicle.

¶ 10     Gritzenbach crossed the street and entered the parked van. Garza was in the driver's seat. Through the back window, Gritzenbach saw a man approach wearing a black hoodie with a white "Nike" logo. The man had been in the vehicle involved in the sign flashing incident. There was a

"big rip" at the bottom of his hoodie; underneath, he wore a baby blue shirt with white letters. Gritzenbach thought the man had a firearm because he was "moving" his hands around his stomach. Gritzenbach identified defendant in court as that man.

¶ 11    Defendant stepped into the van, looked around, and shot Garza three times. He stopped and then fired at least four more times. Gritzenbach lowered her head as defendant fired. When the shooting stopped, Gritzenbach looked up and saw the left side of defendant's face before he ran into the alley. Gritzenbach spoke to police at the scene and at the police station. Later, she viewed a lineup and identified defendant as the shooter.

¶ 12    The State sought Gritzenbach's in-court identification of the clothing worn by defendant when he shot Garza. In a sidebar, trial counsel objected on two grounds. First, counsel objected to the prosecutor wearing gloves while handling the clothing in court because he thought it would be "prejudicial to the jury." Counsel argued that he had been allowed to examine the clothing earlier without wearing gloves. Second, counsel objected because he "had no way of knowing if those are the same clothes [defendant] was wearing" during the shooting. Although police recovered the clothes from defendant's house, he was not wearing them when he was arrested, and no one identified the clothes as belonging to defendant. Over counsel's objections, the trial court allowed the State to present People's Exhibit Nos. 12 and 13 to Gritzenbach for identification, without gloves. She identified the exhibits, respectively, as the sweatshirt and baby blue shirt worn by defendant during the shooting.

¶ 13    On cross-examination, Gritzenbach stated that she had not met defendant before the shooting. When presented with her signed statement to an assistant state's attorney, Gritzenbach acknowledged that she said she "first met Smurf back in February 1999," but further testified that

she meant she could have "bumped into him" or seen him in the neighborhood. Gritzenbach told police that through the rip in the hoodie, she saw a baby blue shirt with white letters spelling "University of North Carolina."

¶ 14    The parties stipulated that, if called to testify, Detective Romic[1] would state that Gritzenbach described the shooter as wearing "[b]lack shorts, white socks, white gym shoes, pullover black hoody and a baby blue jersey with the letters North Carolina."

¶ 15    Chicago police officer Guillermo Cerna testified that on July 3, 1999, just before 4 a.m., he and his partner saw "a crowd of kids" near Sacramento and 63rd. Cortes told them her friend had been shot. Cerna approached the van and found the driver unresponsive. He called for an ambulance and obtained descriptions of the offender, whom people identified as Smurfy. According to witnesses, the shooter wore "all black," with a "black hoodie," above "a North Carolina jersey, baby blue." Cortes knew Smurfy's address and accompanied plainclothes officers to his home.

¶ 16    Chicago police officer Adolfo Garcia testified that around 4 a.m. on July 3, 1999, he and his partner responded to a call for assistance at Sacramento and 63rd. After speaking with Cortes, Garcia and his partner accompanied her to a home on the 6400 block of Mozart. The woman who answered the door told Garcia that Smurfy was her brother. She gave officers permission to enter and "look around." On the second floor, they found defendant shirtless, sitting in front of a television in a bedroom. Two young boys were sleeping in the room. The woman confirmed that defendant was her brother Smurf.

---

[1] The record does not state Detective Romic's first name.

¶ 17    When Garcia handcuffed defendant, he noticed that defendant's heart was beating "real hard." Garcia looked for clothes that matched the shooter's and found a "black hoodie with a North Carolina jersey" next to defendant's chair. He gave the clothing to his partner who later inventoried the items. Outside, Cortes identified defendant as the shooter. Garcia identified People's Exhibit Nos. 12 and 13 as the black hoodie and North Carolina jersey he found in defendant's house. Garcia returned to the crime scene to search for a firearm, but he did not find one.

¶ 18    On cross-examination, Garcia stated that defendant was wearing only white boxer shorts when officers found him in the bedroom. They allowed defendant to "grab some clothes" before transporting him to the police station.

¶ 19    Detective Steve Buglio testified that he arrived at the crime scene around 7:30 a.m. The weather was "very hot and very humid." Later, when Buglio interviewed defendant at the police station, defendant stated that he was a member of the Satan Disciples known as Smurf or Murphy. Defendant had been inside his home "from midnight on." When asked if anyone could verify that he was in the house around 3 a.m., defendant answered, "no because everybody was sleeping." Buglio conducted a lineup that was viewed separately by Gritzenbach, Cortes, and Nathaniel, who each identified defendant as the shooter.

¶ 20    On cross-examination, Buglio denied showing Cortes, Gritzenbach, or Nathaniel pictures of defendant before they viewed the lineup. At the police station, defendant was wearing a white athletic shirt, white underwear, and white jeans with a black belt.

¶ 21    Chicago police detective Michael Rose testified that he interviewed defendant on July 5, 1999. Defendant stated that around 1 a.m. on July 3, 1999, he was in his brother's bedroom watching television while everyone slept. He remained in the room until the police knocked on his

door. When asked if his hands would test negative or positive for GSR, defendant answered "positive" because he had been setting off firecrackers. Informed that only firing a gun would leave GSR, defendant again stated his hands would test positive.

¶ 22    On cross-examination, Rose testified that defendant denied firing a weapon and defendant's hands tested negative for GSR. Rose did not know whether defendant's clothing was tested for residue.

¶ 23    Illinois state police evidence analyst Robert Berk testified as an expert in the field of GSR. He stated that when a weapon is fired, lead, barium, and antimony are emitted. Thus, a person handling a fired weapon will have residue on his or her hands. The elements are not burned into the skin, but are "deposited on the skin," adhering to "skin oil and skin moisture."

¶ 24    Berk analyzed the GSR test taken on defendant. Although defendant's hands tested negative for GSR, Berk explained that a negative result does not mean defendant did not fire a weapon. A person would test negative for GSR if (1) he did not fire a weapon, (2) the weapon did not produce sufficient GSR for detection, or (3) the residue was removed from his hands prior to testing. Residue could also transfer, through "normal hand activity," from the hands to other surfaces so that "positive results may turn into inconclusive and eventually negative findings." Sweating due to hot weather or running could also remove GSR.

¶ 25    On cross-examination, Berk stated that transfer of GSR to clothing "would not be definite," but would depend upon "the environmental situation when the weapon is discharged." He did not test defendant's clothing for GSR. On redirect, Berk confirmed that he found "trace amounts of the barium and antimony" on defendant's hands which, although elevated and significant, did not meet the standards for a positive GSR test.

¶ 26    Cook County medical examiner Dr. Lawrence Cogan testified that he performed Garza's autopsy. He concluded that Garza died from multiple gunshot wounds and the manner of death was homicide.

¶ 27    Outside the presence of the jury, the trial court and the parties discussed which exhibits would be provided to the jury during deliberations. Trial counsel argued that the black hoodie and blue shirt were "never IDed [*sic*] as being the Defendant's," and would, therefore, be "prejudicial." The trial court overruled the objection.

¶ 28    Trial counsel then moved for a directed verdict, arguing that Nathaniel's testimony about observing the shooter's face was incredible given Gritzenbach's testimony that the shooter was inside the van when he shot Garza. Furthermore, in light of Gritzenbach's and Cortes's gang affiliations and biases, their testimony identifying defendant as the shooter carried little weight. The trial court denied the motion.

¶ 29    During closing argument, trial counsel commented on the sweatshirt and jersey recovered from the bedroom. Counsel noted that the bedroom belonged to defendant's brother, who was also in the room along with a friend. Counsel remarked,

> "Lord knows whose sweatshirt and jersey this is. I don't know. And you don't know. And April Gritzenbach who they had I.D. the stuff, how does she know?
>
> How many of these do they sell a year do you think. Do you think its [*sic*] possible that maybe a houseful of boys had a black sweatshirt around that fit the description."

¶ 30    The jury found defendant guilty of first degree murder. After denying defendant's motion for a new trial, the trial court sentenced him to 28 years' imprisonment.

¶ 31    On direct appeal, appointed counsel filed a motion for leave to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967). In his *pro se* response, defendant claimed, in relevant part, that the State presented "fabricated evidence" by "altering" the hooded sweatshirt, and, additionally, the clothes defendant wore on the night of the shooting were on the floor next to his bed and did not include a "hooded sweatshirt." This court allowed counsel's motion to withdraw and affirmed defendant's conviction and sentence. *People v. Danao*, 1-00-3477 (May 6, 2002) (unpublished order under Supreme Court Rule 23).

¶ 32    On April 9, 2003, defendant filed a *pro se* petition for postconviction relief alleging (1) ineffective assistance of trial counsel for failing to challenge biased venirepersons and failing to impeach witnesses, (2) the trial court erred in instructing the jury on evaluating eyewitness identification testimony, and (3) appellate counsel was ineffective for failing to raise the jury instruction issue on direct appeal. The circuit court dismissed the petition as frivolous and patently without merit, and this court affirmed. *People v. Danao*, 1-03-2230 (Dec. 3, 2004) (unpublished order under Supreme Court Rule 23). We found that although the trial court's instruction was improper, the error was harmless where the evidence "was not closely balanced." *Id.* at *8.

¶ 33    Defendant then filed two petitions for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2008)). In the first petition, he argued that the murder statute violated the single-subject rule. In the second, he argued that his three-year mandatory supervised release term was void. The circuit court denied each petition. Defendant appealed from those judgments, and, in each appeal, this court allowed appointed counsel's motion to withdraw under *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the judgment. *People*

*v. Danao*, 1-09-0412 (May 14, 2010) (unpublished order under Supreme Court Rule 23); *People v. Danao*, 1-15-0807 (Nov. 23, 2016) (unpublished order under Supreme Court Rule 23).

¶ 34 On February 15, 2019, through private counsel, defendant filed a "successive petition for post-conviction relief" and a separate motion for forensic testing of the hoodie, which had been impounded at the close of trial. The circuit court allowed the motion for GSR testing at defendant's expense and continued the matter regarding the successive petition. In a separate order, the court directed the clerk of the circuit court to release the sealed bag containing the sweatshirt to a state's attorney representative for transport to Microtrace LLC (Microtrace). On September 25, 2019, after counsel received the test results, the court allowed counsel's request for leave to file an amended successive petition.

¶ 35 On January 23, 2020, again through private counsel, defendant filed a combined "successive petition for post-conviction relief" and "petition pursuant to 735 ILCS 5/1401(a)." Therein, defendant asserted actual innocence based, in relevant part, on the newly discovered affidavit of Juan Pena and the results of recent GSR testing on the black Nike sweatshirt. Alternatively, defendant claimed ineffective assistance of trial counsel for failing to test the sweatshirt for GSR. Defendant attached, *inter alia*, the affidavit of Pena and a GSR analysis report from Microtrace.[2]

---

[2] Defendant also presented the affidavit of another newly discovered witness, Francisco Gutierrez, who averred that Cortes and Gritzenbach, contrary to their testimony, remained actively involved in the Latin Souls gang at the time of trial. On appeal, defendant makes no argument based on Gutierrez's affidavit. Consequently, we will not consider it as a basis to support the claims in his petition. Defendant's petition also alleged that appellate counsel was ineffective for failing to investigate the Nike sweatshirt, but defendant does not argue this point on appeal. See Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) ("[p]oints not argued are forfeited").

¶ 36    In his affidavit, Pena stated that he was born on March 8, 1987, and was currently incarcerated. Early on July 3, 1999, he was outside playing with fireworks when he heard several gunshots near 63rd and Sacramento. Pena "saw a man running toward me with a gun in his hand. As he was running, he was trying to put the gun away in the front of his body; maybe his waistband or a pocket." The man ran by Pena into the alley. Pena described him as "a dark complected, male Hispanic with a goatee," around 30 years old. Pena ran into his house because he was scared. He did not tell anyone outside his family what he had observed. Pena met defendant in 2010 because they "were on the same wing" of the correctional center. In 2016, defendant spoke about his imprisonment and Pena "realized it was connected to the incident" he witnessed in 1999.

¶ 37    The report from Microtrace stated that on June 7, 2019, it received a "black hooded sweatshirt" in a plastic bag for GSR testing. Samples were taken from the "right cuff, left cuff, and the inside and outside of the fabric" next to the horizontal tear on the front of the sweatshirt. Testing revealed no tricomponent particles in the samples. Reasons for the negative results might include (1) the sweatshirt was not in the immediate vicinity of a discharged firearm; (2) any particles deposited were "removed prior to sampling, through typical wear, intentional cleaning/washing, or handling after it was collected as evidence (*e.g.*, at trial)"; or (3) the ammunition did not produce traditional tricomponent particles. Microtrace concluded that "while it cannot be stated that this sweatshirt was not in the immediate vicinity of a discharged firearm, this testing did not find any evidence supporting the proposition that [the sweatshirt] was in the immediate vicinity of a discharged firearm."

¶ 38    On October 20, 2020, the circuit court advanced defendant's combined petition to second-stage proceedings. The State filed a motion to dismiss. On February 11, 2021, after a hearing, the

circuit court dismissed the combined petition. It found that defendant did not demonstrate actual innocence and his ineffective assistance claims involved reasonable trial strategy. Moreover, the evidence was "not that conclusive to establish relief under section 2-1401."

¶ 39     On appeal, defendant argues that the circuit court erred in dismissing his successive petition where he made a substantial showing of actual innocence based on Pena's affidavit and the GSR test results, and of ineffective assistance of trial counsel for counsel's failure to seek GSR testing on the black sweatshirt.[3]

¶ 40     The Act provides a three-stage process for a criminal defendant to assert a violation of his constitutional rights at trial. *People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006). A postconviction proceeding does not substitute for a direct appeal but instead "offers a mechanism for a criminal defendant to assert a collateral attack on a final judgment." *People v. Robinson*, 2020 IL 123849, ¶ 42. "The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal." *People v. English*, 2013 IL 112890, ¶ 22. Therefore, issues raised and decided on direct appeal or in a prior proceeding are barred as *res judicata*, and issues that could have been raised but were not are forfeited. *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 21.

¶ 41     The Act contemplates the filing of only one postconviction petition. *Robinson*, 2020 IL 123849, ¶ 42. To file a successive petition, a defendant must obtain leave of court. 725 ILCS 5/122-

---

[3] On appeal, defendant does not argue that he was entitled to relief for any claim under section 2-1401.

1(f) (West 2020). Here, the circuit court granted defendant leave to file a successive postconviction petition but dismissed his petition at the second stage.

¶ 42    At the second stage, the defendant must make a substantial showing of a constitutional violation to warrant a third-stage evidentiary hearing. *People v. Domagala*, 2013 IL 113688, ¶¶ 33-34. Such a showing is made when the well-pled allegations of a constitutional violation, if proven at an evidentiary hearing, would entitle the defendant to relief. *Id.* ¶ 35. The circuit court examines and rules upon the legal sufficiency of each claim at the second stage. *People v. Johnson*, 206 Ill. 2d 348, 356-57 (2002). We review the dismissal of a postconviction petition at the second stage *de novo*. *Pendleton*, 223 Ill. 2d at 473.

¶ 43    We first consider the dismissal of defendant's ineffective assistance of trial counsel claim. To make a substantial showing of ineffective assistance, the defendant must show that counsel's performance fell below an objective standard of reasonableness, and he was prejudiced by counsel's substandard performance. *People v. Martinez*, 389 Ill. App. 3d 413, 415 (2009). The defendant's failure to establish either deficient performance or prejudice will defeat an ineffective assistance claim. *People v. Johnson*, 2021 IL 126291, ¶ 53.

¶ 44    We view claims of ineffective assistance "not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002). We begin with the presumption that counsel's actions were motivated by sound trial strategy. *People v. Eddmonds*, 143 Ill. 2d 501, 529 (1991). Furthermore, a defendant is entitled to reasonable, not perfect, representation. *Fuller*, 205 Ill. 2d at 331. The "fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish" deficient performance. *Id.*

¶ 45    Defendant contends that trial counsel performed unreasonably by failing to seek GSR testing of the black Nike sweatshirt prior to trial. We disagree.

¶ 46    Witnesses described the shooter as wearing a "black hoodie." Counsel thus sought to distance defendant from the black sweatshirt at trial. When the prosecutor wanted Gritzenbach to identify the sweatshirt in court, trial counsel objected because defendant was not wearing it when he was arrested, and no one identified it as belonging to defendant. During closing argument, trial counsel reminded jurors that police recovered the sweatshirt in the bedroom of defendant's brother, and that his brother and his brother's friend were in the room with defendant. Counsel remarked, "Lord knows whose sweatshirt and jersey this is. I don't know. And you don't know."

¶ 47    Counsel's theory of the case was that the black sweatshirt did not belong to defendant. Defendant agreed with this theory. In his *pro se* response to appointed counsel's motion to withdraw as counsel on direct appeal, defendant denied that he wore the black sweatshirt on the night of Garza's murder. Given the theory of the case, counsel's decision to forego GSR testing on the black sweatshirt reflected reasonable trial strategy. See *Fuller*, 205 Ill. 2d at 33. ("courts have held that such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review").

¶ 48    Relying on Microtrace's testing results, defendant now contends that trial counsel should have acknowledged defendant wore the black sweatshirt and should have tested it for residue prior to trial. Defendant argues that a thorough investigation by counsel would have included testing the sweatshirt for residue before deciding whether to pursue a strategy of denying defendant's ownership of the sweatshirt.

¶ 49 The State responds that trial counsel's strategy was reasonable because had counsel requested testing of the sweatshirt and it tested positive, prosecutors could credibly argue that the result incriminated defendant in Garza's murder. We also note that defendant's hands tested negative for GSR, but Berk gave plausible reasons why that could occur even if defendant had fired a weapon. Specifically, residue could transfer through "normal hand activity" to other surfaces, and sweating due to hot weather or running could remove GSR. If defendant claimed ownership of the sweatshirt and the sweatshirt tested positive for GSR, that evidence would have further undermined the negative result obtained from defendant's hands.

¶ 50 " 'A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.' " *Eddmonds*, 143 Ill. 2d at 529 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). Trial counsel's decision to not test the sweatshirt for GSR was sound trial strategy. "The fact that counsel's strategy did not prove successful, or that counsel might have chosen a different strategy in hindsight, does not render a strategy constitutionally ineffective." *People v. Massey*, 2019 IL App (1st) 162407, ¶ 31. We find that defendant has not made a substantial showing that his counsel performed deficiently.

¶ 51 Defendant also has made no substantial showing he was prejudiced by counsel's failure to test the sweatshirt.

¶ 52 Defendant asserts that Pena heard gunshots and saw a man attempt "to conceal the firearm inside his pocket or waistband as he fled the scene." Defendant argues that due to "the proximity of the firearm to the sweatshirt before, during, and after the shooting, one would expect to find

GSR somewhere on the sweatshirt." He contends that he was prejudiced by counsel's inaction because GSR testing would have established no residue on the sweatshirt prior to trial, thus rendering defendant's identity as the shooter questionable.

¶ 53    As an initial matter, to the extent defendant claims that Pena's affidavit bolsters a claim of ineffective assistance, we observe that defendant does not allege that trial counsel knew or should have known about Pena's observations or existence. See, *e.g.*, *People v. Williams*, 147 Ill. 2d 173, 247 (1991) (rejecting claim of ineffective assistance predicated on counsel's failure to call a witness when, even accepting that counsel knew the witness existed, "[w]e cannot fault defense counsel for failing to pursue a witness who was apparently unavailable"). Moreover, defendant presumes that Pena observed the shooter. Pena's affidavit, however, stated only that he heard shots and then saw a man running as "he was trying to put the gun away in *** his waistband or a pocket." Pena did not observe the shooting, nor did he observe the man shoot the firearm.

¶ 54    Even if we presume that trial counsel had knowledge of Pena, defendant has not shown prejudice. Prejudice is established by showing that, but for counsel's deficient performance, there is a reasonable probability the result of defendant's trial would have been different. *People v. Houston*, 229 Ill. 2d 1, 4 (2008).

¶ 55    Defendant claims that he was prejudiced by trial counsel's inaction because the sweatshirt would have tested negative for GSR, and the negative results would have "bolstered" his misidentification defense. We cannot presume, however, that GSR testing of the sweatshirt prior to trial would have yielded the same negative result Microtrace found in September 2019, approximately 20 years after defendant's trial.

¶ 56    Microtrace explained that negative results could have occurred because particles were removed through "handling after [the sweatshirt] was collected as evidence (*e.g.*, at trial)." Trial

counsel admitted to handling the sweatshirt at trial. Prosecutors also presented the black sweatshirt as People's Exhibit No. 12 for Gritzenbach and Officer Garcia to identify, and it was provided to the jury during deliberations. Defendant's conclusion that the sweatshirt would have tested negative in 1999, before extensive handling by attorneys, is mere conjecture. As such, his claim that a potential negative test would have exonerated him amounts to speculation that falls short of demonstrating actual prejudice. *Johnson*, 2021 IL 126291, ¶ 58.

¶ 57    Defendant has not made a substantial showing that trial counsel performed unreasonably by failing to test the sweatshirt for GSR, or that he was prejudiced by counsel's allegedly deficient performance. Therefore, the circuit court properly dismissed his ineffective assistance of counsel claim.

¶ 58    Next, we consider whether newly discovered evidence consisting of Pena's affidavit and Microtrace's negative GSR test demonstrates defendant's actual innocence.

¶ 59    To establish actual innocence, the newly discovered evidence must make "a persuasive showing that the [defendant] did not commit the charged offense and was, therefore, wrongfully convicted." *People v. Taliani*, 2021 IL 125891, ¶¶ 56-57. In Illinois, a free-standing claim of actual innocence in postconviction proceedings is "cognizable as a matter of due process" under the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2). *People v. Washington*, 171 Ill. 2d 475, 489 (1996). A free-standing claim is one where "the newly discovered evidence is not being used to supplement an assertion of a constitutional violation with respect to trial." *Id.* at 479.

¶ 60    *People v. Hobley*, 182 Ill. 2d 404 (1998), discussed what constitutes a free-standing claim of actual innocence. In *Hobley*, the defendant supported his actual innocence claim with newly discovered evidence of a negative fingerprint report and a second gasoline can, the same evidence

used to support his claim that the State failed to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at 444. The supreme court found that the defendant did not properly raise a free-standing actual innocence claim where the newly discovered evidence was also "being used to supplement his assertions of constitutional violations with respect to [the] trial." (Internal quotation marks omitted.) *Id.*

¶ 61    Here, the State argues that defendant did not present a free-standing claim of actual innocence where he used the same evidence to support his actual innocence claim and his ineffective assistance of counsel claim. Defendant agrees that the same evidence supports both claims but argues that the supreme court left open the possibility to assert both a free-standing claim of actual innocence and a deprivation of a constitutional right at trial based on the same evidence. As support, defendant cites *People v. Martinez*, 2021 IL App (1st) 190490.

¶ 62    In *Martinez*, the defendant appealed from the dismissal of a successive postconviction petition that alleged constitutional violations and actual innocence. The claims derived from the same underlying evidence, namely evidence of a police detective's pattern and practice of engaging in misconduct and new expert testimony regarding witness identification. *Id.* ¶ 46. In holding that the defendant could pursue both claims, *Martinez* acknowledged *Hobley*, but determined that *Hobley* "deviated from both the spirit and the letter of the law as set forth in *Washington*." *Id.* ¶ 102. *Hobley* identified "no principle or purpose" that prohibited "a defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim." *Id.* Furthermore, *Hobley* was inconsistent with the supreme court's "more recent pronouncements on actual innocence" in *People v. Coleman*, 2013 IL 113307. *Id.* ¶ 104.

¶ 63    In *Coleman*, the supreme court noted that "a freestanding actual innocence claim is independent of any claims of constitutional error at trial and focuses solely on a defendant's factual innocence in light of new evidence." *Coleman*, 2013 IL 113307, ¶ 83. Accordingly, "[w]here a defendant makes a claim of trial error, as well as a claim of actual innocence, in a successive postconviction petition, the former claim must meet the cause-and-prejudice standard, and the latter claim must meet the *Washington* standard." *Id.* ¶ 91.

¶ 64    The court in *Martinez* found that *Coleman* thus contemplated that "the *claims* be independent, not that the actual innocence claim be independent of *the evidence* underlying" the other constitutional claim of error. (Emphasis in the original.) *Martinez*, 2021 IL App (1st) 190490 ¶ 104; but see *People v. Griffin*, 2022 IL App (1st) 191101-B, ¶ 33 (rejecting the suggestion that *Coleman* overruled *Hobley* or *Orange*). We agree with *Martinez* and therefore will address defendant's actual innocence claim.

¶ 65    "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47. The conclusive character element is the most important in an actual innocence claim. *Id.*

¶ 66    Pena's affidavit and Microtrace's GSR test results lack such conclusive character, as they do not place the trial evidence in a different light or undermine our confidence in defendant's conviction. *Id.* ¶ 48 (stating the appropriate standard when considering, in an actual innocence claim, whether the factfinder would reach a different result when looking at prior evidence along with the new evidence). Microtrace's negative test was far from conclusive. Although Microtrace did not find evidence that the sweatshirt "was in the immediate vicinity of a discharged firearm,"

it could not determine that "this sweatshirt was *not* in the immediate vicinity of a discharged firearm." (Emphasis added.) Berk testified similarly at trial that transfer of GSR to clothing "would not be definite." Also, Pena did not observe the shooting. His statements therefore add nothing to the identification issue where Nathaniel, Gritzenbach, and Cortes testified that they observed the shooting, and they identified defendant as the shooter. As such, defendant has made no substantial showing of actual innocence. Therefore, the circuit court properly dismissed defendant's actual innocence claim.

¶ 67    For the foregoing reasons, we find that defendant has not made a substantial showing of actual innocence or ineffective assistance of trial counsel and affirm the circuit court's dismissal of his successive petition without an evidentiary hearing.

¶ 68    Affirmed.